[Civ. No. 6480. Fourth Dist. Sept. 18, 1961.]

In re JOHN ROGER SHINN et al., Minors, Persons Coming Under the Juvenile Court Law. BENJAMIN J. SHINN et al., Appellants, v. THE PEOPLE, Respondent.

Richard W. Petherbridge for Appellants.

Stanley Mosk, Attorney General, Edward M. Belasco, Deputy Attorney General, James E. Marable, District Attorney, and Fielding Kimball, Deputy District Attorney, for Respondent.

GRIFFIN, P. J.—The judgment decrees that three minor children of school age were habitual truants under Education Code, section 12403, and that under Welfare and Institutions Code, section 700, subdivision (j), they were wards of the juvenile court. It ordered the parents of the minors to deliver the said children to school and to execute bonds conditioned upon the minors' remaining in school during the school year

under the provisions of Education Code, sections 12408 to 12411.

On February 15, 1960, a petition was filed in the juvenile court alleging that John Roger Shinn, aged 10, Barbara Ann Shinn, aged 12, and Mary Elizabeth Shinn, aged 13, were habitual truants; that each was in danger of leading an idle, dissolute or immoral life; and each was violating the provisions of Education Code, article 7, chapter 6, division 9, which is the compulsory full-time education law. Each child was then in the immediate control of Benjamin J. Shinn and Mary Shinn, their parents. The above-named minors and parents appeared in court, with counsel, on March 11, 1960, and, by consent, the matter was continued to March 18, 1960. On February 25, 1960, an information was filed by the district attorney against the parents accusing them in nine counts with contributing to the delinquency of the above-named minors in violation of Welfare and Institutions Code, section 702, alleging that between November 24, 1959, and December 19, 1959, they willfully and unlawfully permitted and encouraged these minors to remain absent from school attendance without valid excuse and that it did tend to cause them to become persons coming within certain provisions of Welfare and Institutions Code. On March 11, 1960, counsel for defendants moved to set aside the information under Penal Code, section 995. A hearing was set for March 18, 1960. On March 22, the motion was denied. Defendants pleaded not guilty and the trial was set for May 16, 1960. On March 18, the court proceeded to hear the juvenile court petition and after some evidence was taken counsel for the minors moved for a continuance of one week, which continuance was granted, and on April 1 moved to stay further proceedings until after trial of the criminal contributing case. The continuance was denied and the hearing proceeded. The court appointed a psychiatrist to examine the children and report to the court on April 8. During this period, the criminal complaint against the parents was dismissed. A further hearing was had on April 29. Witnesses were sworn and the report of the psychiatrist was considered along with the report of the probation officer, which reports were placed of record. The court made findings on May 3 that none of the children had a physical or mental condition such as would prevent or render inadvisable attendance at school as provided by Education Code, section 12152; that said children resided within the school district and within

a distance of two miles from the school house; that said children were not being instructed in a private full-time day school by persons capable of teaching and they were not being instructed by a tutor or other person holding a valid state credential for grades taught; and that there was no parental school in the county. Judgment followed that each minor child be adjudged a ward of the juvenile court. In paragraph 3 of the judgment, it provides that the parents, beginning May 6, 1960, shall deliver the children to the proper school in El Centro School District as designated by the superintendent, at the beginning of each school day for the remainder of the school term. Paragraph 4 provides that if the parents shall, within three days, execute a bond to the governing board, under Education Code, section 12411, in the sum of $200 for each child, conditioned that each one will during the remainder of the current school year attend some public or private school in that city, and further conditioned that the children shall not be insubordinate or disobedient during their attendance, then the court may suspend that portion of the judgment contained in paragraph 3. Appellants appealed. Execution of judgment was stayed pending appeal.

The people of California recognize that maintenance of a democratic form of government depends in part upon an educated citizenry and declared in their Constitution that a general diffusion of knowledge and intelligence was essential to the preservation of the rights and liberties of the people. They made it the duty of the Legislature to encourage by all suitable means intellectual, scientific, moral and agricultural improvement. (Cal. Const., art. IX, § 1.) As a means of achieving a general diffusion of knowledge and intelligence, the Legislature was directed to provide for a public school system of common free schools. (Cal. Const., art. IX, §§ 5, 6, 7 and 14.) In obedience to the constitutional mandate to bring about a general diffusion of knowledge and intelligence, the Legislature, over the years, enacted a series of laws. A primary purpose of the educational system is to train school children in good citizenship, patriotism and loyalty to the state and the nation as a means of protecting the public welfare. (*Gabrielli* v. *Knickerbocker*, 12 Cal.2d 85, 92 [82 P.2d 391].) The Supreme Court of the United States, in the case of *Pierce* v. *Society of Sisters*, 268 U.S. 510 [45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468], held that:

"No question is raised concerning the power of the state reasonably to regulate all schools, to inspect, supervise and

examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare.''

Included in the laws governing the educational program were those regulating the attendance of children at school and the power of the state to enforce compulsory education of children within the state at some school is beyond question. (*Meyer* v. *Nebraska,* 262 U.S. 390 [43 S.Ct. 625, 628, 67 L.Ed. 1042, 29 A.L.R. 1446]; *Ex parte Liddell,* 93 Cal. 633, 640 [29 P. 251].) The basic compulsory education law is set forth in Education Code, section 12101, reading:

''Each parent, guardian, or other person having control or charge of any child between the ages of 8 and 16 years, not exempted under the provisions of this chapter (commencing at Section 12101), shall send the child to the public full-time day school for the full time for which the public schools of the city, city and county, or school district in which the child lives are in session.''

The Legislature recognized that there must be certain necessary exceptions to the compulsory education law and excused the attendance at public school of those children whose mental or physical condition prevents or renders it inadvisable for them to attend school. (Ed. Code, § 12152.) See also Education Code, section 10553.

### EVIDENCE

A carefully prepared and succinct statement of the evidence, the points raised on appeal, authority cited in support of the conclusions reached, and a general résumé of the objects and aims and purposes of the educational system of California is set forth in respondent's brief. We will therefore, in the interest of time, adopt portions of it.

In September 1954, Dr. Shinn and his wife moved to Imperial County. Until their removal from school by the parents, the three minor children herein involved attended public schools in the El Centro School District. John was in the first grade. His teacher found him to be an above-average student. His first report card was average, and he was in the middle reading group. In the second grade, he was given the Science Research Associates achievement test and his

composite grade was 3.5. The class norm was 2.4. John was permitted by his father to skip the third grade.

Mary Elizabeth was a pupil in junior high school, eighth grade. Her arithmetic teacher found her to be an average student, but because she had skipped a grade the preceding year at her father's request she was younger than the other students, which made it more difficult for her to adjust. The Science Research Associates achievement test was taken by 290 eighth grade students on October 8, 1958, and Mary had a composite grade placement of 9.6, giving her a range of 47th in a class of 290. The norm for the class was 8.1. Mary's physical education teacher found her to be average, as did her home-making teacher.

Barbara Ann was a pupil in junior high school. She was given the Metropolitan achievement test while in the sixth grade and placed 64th out of 339. Her composite grade was 7.4. The norm was 6.1. Her teacher found her to be an above-average student among other above-average students in the class.

Dr. Shinn was a veterinarian. His wife was a musician and was employed part-time at the Reception Center for Contract Laborers in El Centro. Neither Dr. Shinn nor his wife had a teaching credential. He was not qualified to receive a teaching credential, needing another year of college. He did not have formal instruction in education. He preferred certain teaching methods practiced in the schools of Wisconsin. When John was in the first grade, Dr. Shinn began giving him school work at home. The supplemental educational program at home instituted by Dr. Shinn was also applied to his daughters. However, the daughters, who enjoyed public school and felt that what they were doing in public school was sufficient, resisted the program.

On February 3, 1958, Dr. Shinn had a conference with the principal concerning the conduct of John, who, after skipping the third grade, had been placed in the low reading group of his fourth grade class. Dr. Shinn was informed that John refused to apply his energies and talents to the classroom, had become a disciplinary problem of such magnitude that he interfered with the function of the teacher, and exhibited an attitude of contempt toward his school and his teacher. On February 4, 1958, Dr. Shinn spoke to the superintendent of schools concerning the conference with the principal and informed him that since John was cooperative and responsive at home he was removing John from school to teach and train

him at home. John was removed from public school that day. Dr. Shinn commenced an accelerated course of study for John at home and between February 1958 and September 1959 promoted him from the fourth grade to the ninth grade. John had no formal course in geography, no study of United States history, no art instruction, no music instruction aside from piano lessons, no group physical education and no eighth grade spelling.

Mary Elizabeth and Barbara Ann remained at school for another year, during which time they were subject to the supplemental education program instituted by Dr. Shinn. On May 5, Dr. Shinn informed the principal that he was dissatisfied with the minimum education provided his daughters and had decided to remove them from public school and he then did so.

The principal wrote Dr. Shinn on June 9, 1959, relative to the compulsory education law and advised him of the legal requirements regarding the education of children. Dr. Shinn informed him that he had worked out an educational program for his children which consisted of enrolling the children in a high school correspondence course and requested an endorsement of and participation in the program by the superintendent of schools. The principal thereafter had a number of discussions with Dr. Shinn concerning the Shinn children, including a meeting relative to correspondence courses. He advised Dr. Shinn that correspondence courses conducted by the University of California could be used as a means of enriching and supplementing the regular school program and of acceleration, but could not be used as a substitute for the school program. He informed Dr. Shinn that he did not have the legal authority to waive the legal requirements that the Shinn children attend public school.

In August 1959, Dr. Shinn, being unable to enroll his children in the University of California Correspondence School, communicated with the International Correspondence School at Scranton, Pennsylvania and on September 10, 1959 enrolled Mary Elizabeth, Barbara Ann and John in the latter correspondence school. All three children were placed in the ninth grade. Text books and materials for instruction were received by mail. The program was one of self-education. The children commenced school work at about 8 a. m. and there was a break of three-quarters of an hour or an hour late in the morning; work was then resumed at 12 noon. There was

no rigid schedule. The children had no instruction in history of California nor any formal courses in civics after leaving public school. Dr. and Mrs. Shinn, in maintaining the process of self-education for the children, acted as proctors and considered themselves instruments for the International Correspondence School. Dr. Shinn anticipated that continuation of the International Correspondence School course would result in the children's having completed high school by September 19, 1961. On September 22, 1959, the superintendent of schools reported to the welfare and attendance supervisor for that county that the children were not enrolled in the El Centro schools. In response to a letter, Mrs. Shinn called at that office and advised the worker that she and Dr. Shinn were educating the children at home. Mrs. Shinn stated that neither she nor Dr. Shinn had a credential and were aware that they were breaking the law since the superintendent had sent them a copy of the code sections.

On November 24, 1959, the superintendent certified to the welfare worker that the children were not then enrolled in the public schools. The welfare worker visited the Shinn home where she found the children to be well and in fine physical condition. As a result of this visit, she prepared truancy reports on the three children for the district attorney. About December 14, she received communications from the superintendent certifying that the three Shinn children were not enrolled in the schools on that date.

On December 16, 1959, the welfare worker and a police sergeant called at the Shinn home in the morning where they saw Dr. and Mrs. Shinn and the children. They ascertained from them that none of the children were sick and at no time had the children been too sick to go to school. As a result of that visit, the welfare worker prepared the second group of truancy reports on the Shinn children.

On December 18, 1959, the welfare worker received a fourth communication from the superintendent of schools, again certifying that the Shinn children were not enrolled in the El Centro schools. As a result, the county health consultant called at the Shinn home and, in a discussion with Dr. and Mrs. Shinn, learned that the children were all in good health. The welfare worker again made three more reports setting forth that they were habitual truants. The petition to the juvenile court which instituted the instant proceeding was signed by her.

## Report of Psychiatrist

This report recites that the children examined by him were normal, of better than average intelligence, with no mental abnormality; that they were well adjusted to meeting strangers and could adjust to being in class with other children; that the competition in class with other children and the "give and take" which children encounter in school would benefit the Shinn children emotionally and socially and would serve them well in taking their places in the world; that it was his belief that teaching in a family group, as instituted by Dr. Shinn, created an abnormal situation by virtue of the differences in the ages of the children, since in school each individual child would be in his own age group and would have a better chance to compete and to learn by hearing the others go over the same class work; that the absorption of knowledge in school under such circumstances is superior to a situation where each child merely has to accomplish a certain amount of work on his own. He expressed his opinion that it is deleterious to force a child to advance intellectually beyond his growth and there was no reason why one should attempt to so accelerate a child's progress merely for the sake of seeing that he had achieved a goal educationally before he is of mature age, since cognizance must always be taken of the emotional growth and chronological age of a child during his intellectual progress. He did not find the Shinn children to be exceptionally well educated children and said he would not be able to conclude that they were child prodigies without having given them psychological tests to rate them.

Dr. Shinn testified generally that in August 1959 he made application to the International Correspondence School in Pennsylvania requesting that his children be enrolled in a high school course; that the children were examined and questioned by representatives of that school and were enrolled in the course in September 1959; that the course, as set out at that time, listed the courses to be taken by the three children in the completion of high school requirements. He testified that he maintained a roll in which he entered the attendance record of each of the three children in question; that the courses were taken in sequence, that is, the children would study one subject at a time, conclude a unit in that particular subject and then take an examination in it, then move on after completion of that unit to some other course; that in addition to the courses prescribed by that school, the children studied

other subjects, such as music and Russian and in a more formal way they discussed history and civics with the family. The records of the children in that school were made a part of the record. Also introduced was a pamphlet issued by the National Home Study Counsel entitled "List of Accredited Private Home-Study Schools" and this list contained at the bottom of one of its pages the statement: "The accrediting commission has been approved by the U. S. Office of Education as a nationally recognized accrediting agency under the terms of Public Law 8082-550 and 85-864."

Counsel for the Shinns introduced a letter from the California State Department of Education stating in part: ". . . the determination as to whether an organization is a bona-fide private school within the meaning of section 12154 is made by the local school authorities and law enforcement authorities."

In this regard it was the contention of the Shinns throughout the proceedings in both actions that their children were attending a private school within the meaning of Education Code, section 12154, and also that their children had advanced beyond the level of education of other children of similar age enrolled in the public schools, as a consequence of which it would be inadvisable to enroll the Shinn children in public school. Therefore, under Education Code, section 12152, they were exempted. The final exhibit introduced by the Shinns was a report based upon their doctor's study of the children. He found the children well ahead of other children of similar age in academic achievement.

The main issue presented is: Did the Shinn educational program fall within the exceptions created by Education Code, sections 12152 and 12154?

The Legislature recognized that there must be certain necessary exceptions to the compulsory education law and excused the attendance at public school of those children whose mental and physical condition prevent or render it inadvisable for them to attend school (Ed. Code, § 12152) and those children who live an unreasonable distance from school (Ed. Code, § 12153) and those children who are blind or deaf (Ed. Code, § 12156). Appellants claim their children come within the exception because their superior mental condition rendered it inadvisable for them to attend school. Education Code, section 12154, also provides for exemption for children educated in private full-time day schools or by private tutors holding valid state teaching credentials. (Ed. Code, § 12155.)

The Legislature has recognized the principles stated by the United States Supreme Court in *Pierce* v. *Society of Sisters, supra,* 268 U.S. 510 [45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468], that:

"The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only." and has provided the exemptions indicated.

 It does not appear that it was intended that Education Code, section 12152, applied to children of superior intelligence and that they should be exempted from school attendance. This section applies where their physical or mental condition is such as to prevent them from applying themselves to study or from attending school. Reference is made to Education Code, section 10553, as being applicable. It recites: "The governing board of the school may exclude from attendance on regular school classes any child whose physical or mental disability is such as to cause his attendance to be inimical to the welfare of other pupils."

In *Ward* v. *Flood,* 48 Cal. 36 [17 Am.Rep. 405], this law was applied where a principal of a public graded school refused a child admission as a scholar where such child had not sufficient education to enter the lowest grade of such school. Appellants' could not reasonably contend this condition applied to the minors here involved. At any rate, the question of exemption was one for the determination of the proper school authorities and not by the parents. No such exemption was here granted and no satisfactory proof was furnished to them. Education Code, section 12152, *supra,* furnished no exemption to the minors here involved under the facts presented. Appellants could not be the judge of such claimed exemption.

 The educational program described by the Shinns cannot be classified as a private full-time day school within the meaning of Education Code, section 12154, which would entitle their minor children to be exempt from attendance at public schools. *People* v. *Turner,* 121 Cal.App.2d Supp. 861 [263 P.2d 685], held that the compulsory education law exempting students in "private schools" did not comprehend a parent or private tutor instructing at home. Education Code, section 12155, *supra,* requires that the tutor or other person shall hold a valid state credential for the grade taught. The parents of these children admittedly held no such cre-

694

dential. Proof of proper instruction and study would be no defense to a prosecution for neglecting and refusing to send children to public school. (*People* v. *Turner, supra,* 121 Cal. App.2d Supp. 861.) There was no evidence introduced at the hearing that teachers from the International Correspondence School described were present at the Shinn home to teach the children. To qualify as a bona fide school, a place of learning must have competent teachers capable of teaching. The evidence indicates that appellants, in conducting their self-education program, failed to fully comply with Education Code, section 7901, setting forth the courses required to be taught at a private school. Dr. Shinn admitted that the children did not receive any instruction in civics or in California history. Home education, regardless of its worth, is not the legal equivalent of attendance in school in the absence of instruction by qualified private tutors. Accordingly, the juvenile court had evidence to support its finding that the Shinn children were not being instructed in a private full-time day school by persons capable of teaching. It was justified in concluding that appellants violated the compulsory education law.

Next, it is claimed that if Education Code, section 12154, was properly applied and the trial court properly held that the Shinn educational plan did not create an exemption, the law, as applied to appellants, unconstitutionally restricts the parents' control over the education of their children. (Citing *Meyer* v. *Nebraska, supra,* 262 U.S. 390 [43 S.Ct. 625, 67 L.Ed. 1042, 29 A.L.R.2d 1446]; *Hardwick* v. *Board of School Trustees,* 54 Cal.App. 696 [205 P. 49].)

The California compulsory education law, with its reasonable exceptions, was held constitutional in the case of *People* v. *Turner, supra,* 121 Cal.App.2d Supp. 861. No arguments presented by appellants and no legal authorities cited by them justify a different conclusion being reached concerning the constitutionality of the compulsory education law.

''The education of the children of the state is an obligation which the state took over to itself by the adoption of the constitution.'' (*Piper* v. *Big Pine School Dist.,* 193 Cal. 664, 669 [226 P. 926].) (See also *Pierce* v. *Society of Sisters, supra,* 268 U.S. 510 [45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468]; *Meyer* v. *Nebraska, supra,* 262 U.S. 390 [43 S.Ct. 625, 67 L.Ed. 1042, 29 A.L.R. 1446]; *Ex parte Liddell,* 93 Cal. 633, 640 [29 P. 251].)

## Wardship Proceedings

■ Appellants stress the claim that the wardship proceeding here instituted was not contemplated by the statute and is authorized only where there is a lack of parental supervision or where such supervision tends to lead the minor toward a life of crime, and accordingly the court had no jurisdiction to institute or maintain such proceedings under the facts related. (Citing *People* v. *Renteria*, 60 Cal.App.2d 463 [141 P.2d 37].) It is also argued that there is not shown any misbehavior on the part of the children or any need for supervision by juvenile authorities because they obeyed their parents who frankly stated that ". . . the entire responsibility of failing to enter their children in public school rests with them." We see no merit in this argument.

Under the law, these minor children became truants when they did not return to school and there were no valid excuses for their absence. (Ed. Code, § 12401.) They became habitual truants when their truancy occurred and was reported on three separate occasions. (Ed. Code, § 12403.) The court so found upon sufficient evidence. This evidence subjected the children to the provisions of the juvenile court law. (Ed. Code, § 12408.) Also, such conduct brought them within the purview of Welfare and Institutions Code, section 700, subdivisions (j) and (m). Education Code, sections 12408 to 12413, makes provision for the county superintendent of schools in which the truancy occurs to petition the juvenile court for an order directing that the truant child be maintained in a parental school, or be kept at regular school under the control and charge of his parents. Provision is made for the parent to be placed under bond to insure compliance with the compulsory education law. See *In re Steiner*, 134 Cal.App.2d 391, 394 [285 P.2d 972]; *People* v. *Renteria*, *supra*, 60 Cal.App.2d 463, 468.

## Due Process of Law

■ Some complaint is made because the real issue is the behavior of the parents in keeping the children from attending school; that in effect the judgment and order here involved punishes them; that the parents were deprived of a jury trial and certain rights they would ordinarily have in a criminal case; that since the school board did not make a full and impartial report, as required by Education Code, section 12451, they were denied due process of law under the Fourteenth Amendment to the Constitution of the United States.

". . . the summary procedure provided by the juvenile court laws is more in the character·of a guardianship whereby the minor is relieved of the stigma of a criminal conviction by placing him on probation with individuals or in institutions having the facilities to give him corrective care, supervision, and training.

". . . a trial as such is not contemplated under the spirit or procedure provided by the juvenile court laws. . . . Not only is its purpose more reformative than punitive, but its method of operation is different from that of a criminal court. Technicalities and formalities are largely done away with, and its simple procedure is designed to gain the confidence of those coming within its operations, and to enable the judge to best guide and control its wards with more consideration for their future development than for past shortcomings. The circumstances attendant on contested jury trials are out of place there, and might have an injurious effect, not only on the methods, but also on the atmosphere and confidence that have been built up around the work of the juvenile court, and which are so largely responsible for its success." (15 Cal.Jur.2d § 9, pp. 638-639.)

There is no infringement of constitutional rights because a minor is not accorded a trial by jury. The order of commitment is not for the purpose of inflicting punishment, but to provide suitable guardianship whether by individuals or in state schools. (*In re Daedler,* 194 Cal. 320 [228 P. 467].) The *parents* are not being tried or prosecuted in a juvenile court law proceeding. (Welf. & Inst. Code, § 720; *In re Dargo,* 81 Cal.App.2d 205, 207 [183 P.2d 282].) Adequate provision is made in Education Code, section 12454, for dealing with parents.

Some argument is presented to the effect that the trial court abused its discretion in denying appellants' motions to continue the wardship matter pending the determination of the criminal action. We see no merit in this contention. These were two separate and distinct proceedings and were to be tried by separate judges. It was apparent that appellants were endeavoring to bring the criminal case to trial before the hearing in the wardship proceeding. The criminal action was dismissed. No abuse of discretion appears.

Lastly, appellants claim the trial judge was guilty of prejudicial misconduct by presiding over the case at bar. No affidavit of prejudice against the judge was filed. The trial court made certain remarks from which appellants be-

lieved the judge was "reacting to pressures." We found nothing in the court's remarks to justify the conclusion. The opinion of a juvenile court judge rendered at a judicial hearing does not amount to bias and prejudice merely because it was adverse to one of the parties. (*In re Steiner, supra,* 134 Cal.App.2d 391.)

The juvenile court upheld the compulsory education law and its enforcement through civil process. It was a judicial determination that the educational program of the State of California was designed to promote the general welfare of all the people and was not designed to accommodate the personal ideas of any individual in the field of education.

Judgment affirmed.

Shepard, J., and Coughlin, J., concurred.