[Civ. No. 15909. Fourth Dist., Div. Two. Dec. 21, 1976.]

CHERIE ABELLA, Plaintiff and Appellant, v.
RIVERSIDE UNIFIED SCHOOL DISTRICT et al.,
Defendants and Respondents.

**COUNSEL**

Ronald L. Taylor, Maurice Jourdane and David B. Bryson for Plaintiff and Appellant.

Ray T. Sullivan, Jr., County Counsel, James H. Angell, Assistant County Counsel, W. W. Miller and Gerald Blankenship, Jr., Deputy County Counsel, for Defendants and Respondents.

## OPINION

**MORRIS, J.**—This is an appeal from a judgment of the Superior Court of Riverside County holding that the defendant, Riverside Unified School District, legally exempted the plaintiff, Cherie Abella, from school attendance under Education Code section 12152.

### Statement of Facts

Plaintiff, Cherie Abella, was an eighth grade pupil at University Heights Middle School in defendant school district during the school year 1973-1974. Before coming to middle school, Cherie Abella had done exceptionally well throughout elementary school, and had received the "Student of the Year" award during the sixth grade. Her grades during the last year of elementary school were A's and B's.

Upon coming to middle school, Cherie began having problems, and did below average work throughout most of the seventh grade. She was defiant toward teachers, created disturbances, and was truant. When Cherie began the eighth grade on September 17, 1973, and her problems continued, the school administrators decided that Cherie should be in a "special opportunity class" established for children who are in danger of becoming habitually truant or insubordinate. Cherie resented this arrangement, became bored with the class, and particularly disliked being labeled "mentally retarded and stupid" by the other children. Cherie continued to have trouble at school, and on September 28, 1973, she became involved in a fight with another student at the school.

It was this fight that precipitated the "exemption" which is the subject matter of this lawsuit. Because there is a conflict in the evidence regarding some of the events leading up to Cherie's removal from school, we will limit this statement to the relevant facts gleaned from the findings of the trial court.

A conference was held on September 28, 1973, attended by Vernon Bell, the principal, Mrs. Virginia Brauner, the dean of students, Dr. Telford Moore, a school psychologist, and Mrs. Jan Thomas, the mother of Cherie Abella.

During this conference, the parties discussed the advisability of Cherie's continued attendance at school and Cherie's mother stated that Cherie had been in therapy with psychologists in past years, that Cherie

had been on medication to help calm her down, and that Cherie had been treated at the U.C.L.A. Psychiatric Clinic.[1] All parties present at the conference expressed their views on how Cherie's problem could best be handled.

A second conference was held on October 3, 1973, to discuss Cherie's problems and her future attendance at school. This conference was attended by Mr. Bell, Mrs. Brauner, Mrs. Thomas and Dr. Hazel Russell, a consultant on child welfare and attendance for the school district. All those present from the school district agreed that Cherie Abella should be exempted from school under Education Code section 12152 because of her inability to function in the special opportunity class, that psychological evaluation and counseling was needed, and that Cherie would be returned to school upon the advice of a professional counselor. (Although not in the court's findings, the parties agree that this conference followed Mrs. Thomas' attempt to return Cherie to school after Cherie's removal from school on Sept. 28, 1973.)

On November 14, 1973, Mr. Bell, Mrs. Brauner, Dr. Russell and Mrs. Thomas met together and discussed Cherie's progress in counseling.

Cherie was readmitted to eighth grade on March 4, 1974, and graduated from the school on June 20, 1974.

The trial court also found that at the time of Cherie's formal exemption from school in October 1973,[2] the defendant district followed the existing board policies and regulations on exemption, and that the board policies were modified in May 1974, and again on March 12, 1975. The trial court made further findings relating to the new board policies and regulations, interspersed with additional findings regarding the action taken in the case of Cherie Abella.

We include only those additional findings relating to the procedure followed in the case of Cherie Abella.

The court found that: "The Screening Committee considered the case of this child and considered the point of view expressed by the child's mother before deciding whether or not to grant an exemption for this particular child."

---

[1] The evidence was that these problems occurred at the time of her parents' divorce when Cherie was five years old.

[2] She was in fact excluded on September 28, 1973.

"Prior to the exemption of Cherie Abella, she received no psychological counselling from the School District and she was not evaluated by a psychologist or psychiatrist."

"At the time of the exemption of Cherie Abella, the persons recommending exemption had no information or diagnosis from a physician, a psychologist or psychiatrist, which related to the mental condition of Cherie Abella."

"Prior to the exemption of Cherie Abella, she received no counselling from the School Counselor or School Psychologist, no attempt was made to remedy her problems through short term suspension, she was not considered for placement in the educationally handicapped program, and no suggestion was made that she receive psychological evaluation and treatment if necessary while continuing to attend school."

The court also found that although Mrs. Thomas, Cherie's mother, signed the exemption card on October 3, 1973 ". . . Mrs. Thomas objected to the exemption but reluctantly signed the card after being advised that Cherie could be exempted without Mrs. Thomas' consent, and that it would not be reflected in Cherie's cumulative record."

"The exemption of Cherie Abella lasted over 5 months and is recorded in Cherie's cumulative record."

On December 27, 1973, the plaintiff, Cherie Abella, brought this action, denominated a class action, against the defendant, Riverside Unified School District, seeking declaratory relief and a permanent injunction preventing the district from exempting her or any other student similarly situated. The plaintiff also asked the court to compel the district to provide tutoring to any student who is exempted.

The trial court held that the plaintiff's action was not a proper class action, denied all relief requested, and declared "that Education Code Section 12152, both on its face and as it has been applied by the Riverside Unified School District, does not deny the plaintiff, Cherie Abella, and those she represents, equal protection and due process of law under the provisions of the United States Constitution and the California Constitution."

This appeal followed.

*Discussion*

■  We consider at the outset the question whether the issues raised in this appeal are moot because plaintiff is no longer on exempt status, or because of changes in district's regulations relating to exemption. We have concluded that they are not.

At the time of trial, in March 1975, Cherie Abella was a ninth grade student in the Riverside Unified School District and still subject to the exemption process. Furthermore, although the procedures followed by the district in processing an exemption have been modified, the practice of involuntary removal on grounds authorized for exemption in Education Code section 12152 still exists. It is this practice that is under attack in this appeal. Therefore, it is a matter of continuing interest to plaintiff and to other children in the Riverside Unified School District. "If a matter is of general public interest and is likely to recur in the future, a resolution of the issue is appropriate." (*Green* v. *Layton,* 14 Cal.3d 922, 925 [123 Cal.Rptr. 97, 538 P.2d 225].)

Plaintiff contends that Education Code section 12152 does not authorize the school district to initiate the exemption over the parents' objection, and that the manner in which the school district effected the removal of plaintiff from school attendance violated her constitutional right to due process. We agree.

■  1. We have concluded that Education Code section 12152 does not establish grounds for the involuntary removal of a child from public school attendance.

Both the statutory language and the legislative history of Education Code section 12152 support plaintiff's contention that the legislative objective was to relieve the specified category of children from the obligation of public school attendance, and to exempt their parents from the penalties, otherwise imposed, for a violation of the compulsory attendance laws.

Section 12152 is found under division 9, chapter 6, the chapter entitled "Compulsory Full-Time Education." Chapter 6 identifies those children who are subject to compulsory school attendance, listing the · classes of children who may be exempt from compulsory attendance, and establishing criminal sanctions against a parent having control or charge of the child "who fails to comply with the provision[s] of this chapter,

unless excused or exempted therefrom. . . ." (Ed. Code, div. 9, ch. 6, §§ 12152-12454.)

Under section 12152, the first category of children subject to exemption are identified as follows: "Children whose physical or mental condition is such as to prevent, or render inadvisable attendance at school or application to study shall be exempted, and the governing board of the school district shall require satisfactory evidence of the condition to be furnished." (Ed. Code, § 12152.)

Other classes of children subject to exemption are those who are being instructed in private full-time day school; those who are being tutored, provided tutoring meets the statutory requirements; those who are in entertainment or allied industries; those who are blind or deaf, under limited circumstances; and those who hold work permits. (Ed. Code, § 12154 et seq.)

It appears clear from an examination of these provisions that the Legislature intended section 12152 to do exactly what the language implies, excuse from the obligation of complying with the compulsory full-time education requirement those who seek to be excused, provided they can furnish satisfactory evidence of the condition which renders attendance "inadvisable."

The historical development of the exemption sections lends further support to plaintiff's contention that the exemption provision does not authorize a school district to initiate the action to remove a child over the parents' objection.

The system of compulsory education was established in California in 1903. As originally enacted, the "Act to Enforce the Educational Rights of Children" read in pertinent part as follows:

"SECTION 1. Unless excused as hereinafter provided, each parent, guardian, or other person . . . having control or charge of any child between the ages of eight and fourteen years, shall be required to send such child to a public school . . . *provided,* that should it be shown to the satisfaction of the board of education of the city . . . or of the board of trustees of the school district, in which such child resides, that the child's bodily or mental condition is such as to prevent or render inadvisable attendance at school, or application to study, a certificate from any reputable physician that the child is not able to attend school, or that its

attendance is inadvisable, must be taken as satisfactory evidence by any such board, [other grounds for exemption are here stated] . . . *then it shall be the duty of such board . . . upon application of the parent,* or guardian, or other person having the control or charge of such child, *to excuse such child from attendance* at school, during the continuance of such defect or condition upon which such excuse is granted; . . ." (Stats. 1903, ch. 270, § 1, p. 388.) (Italics added.)

This law was periodically amended to expand the exemptions, and to require the filing of a physician's certificate in cases where the physical or mental condition was asserted.

If there was any doubt about the legislative intent in these early enactments, it was removed when the act was amended in 1927 to provide for exemption as follows:

"(1) Children whose physical or mental condition is such as to prevent or render inadvisable attendance at school or application to study; *provided,* that the governing board of the school district may require satisfactory evidence of such condition to be furnished; *and provided, further,* that said *governing board may, itself, exclude* from attendance on regular school classes any child whose physical or mental disability is such as to cause such *attendance to be inimical to the welfare of other pupils."* (Stats. 1927, ch. 227, § 1, pp. 411-412.) (Italics added.)

This amendment demonstrated two things. First, the Legislature was aware of the connotative distinction between the words "exempt" and "exclude." Language of exemption was retained with respect to children who were to be relieved of the obligation to attend upon proper application and proof, and language of exclusion was used in granting the governing board the right to bar a child from attendance. The second, and equally significant, aspect of this amendment was the inclusion of a different standard in those cases in which the board was empowered to act on its own initiative.

The provisions for exemption were adopted in contemplation of the rights of the exempt child and its parents; they were concerned with the best interest of that child. Therefore, in the case of the exemption for mental or physical condition, it was only necessary to show that the child would not benefit from school attendance. The amendment recognized

the rights of other children and permitted the governing board to exclude a child, provided the child's mental or physical condition caused its attendance to be *inimical to the welfare of other children.* Such finding was clearly intended to be a condition precedent to the board's exercise of the power to exclude.

The next and last significant alteration in the law relating to exemptions came in 1929 when the Legislature adopted the School Code. The codification was not intended to produce any substantive change in the law. It was to constitute a compilation and restatement of the existing laws relating to the public school system. (See commentary on the Ed. Code, as revised, by Ernest H. Kunzi, Dep. Legis. Counsel, and published in the 1969 ed. of West's Ann. Cal. Ed. Code.) The act adopting the School Code provided as follows: "Preliminary Provisions . . . 2. The provisions of this Code so far as they are substantially the same as existing statutes, must be construed as continuations thereof, and not as new enactments." (Stats. 1929, ch. 23, p. 1.)

The two major achievements of the School Code were the compilation of existing laws relating to schools in one code, and the grouping of these laws by major subject matter within the code.

It was at this time that the provisions authorizing the governing board to *exclude* children whose attendance would be inimical to the welfare of other pupils was removed from the chapter dealing with exemptions and transferred to the chapter containing other provisions for the exclusion, suspension, and expulsion of pupils. (Stats. 1929, ch. 23, div. I, parts I-II, p. 2 et seq.)

This separation has survived all subsequent changes in the law. The Education Code now provides in much detail for the organization, government, and maintenance of the public school system, including provisions identifying the children who are subject to compulsory full-time attendance and the children who are or may be exempted or excluded therefrom.

As previously noted, the exemption provisions, including section 12152, are found in division 9, chapter 6, entitled "Compulsory Full-Time Education."

Provisions pertaining to the admission, exclusion, suspension, expulsion, special classes and programs, and regulation of pupil activities are found in division 9, chapter 1 of the Education Code, entitled "General Provisions."

Provision is made for exclusion, suspension and expulsion as follows:

The governing body may exclude "children of filthy or vicious habits, or children suffering from contagious or infectious diseases." (Ed. Code, § 10552.)

The governing board may exclude "any child whose physical or mental disability is such as to cause his attendance to be inimical to the welfare of other pupils." (Ed. Code, § 10553.)

A teacher may suspend, "for good cause, any pupil from his or her class for the day of the suspension and the day following." (Ed. Code, § 10601.)

The principal of a school may suspend, "for good cause, any pupil from the school," subject to certain limitations for "not [to] exceed five schooldays." (Ed. Code, § 10601.5.)

Other sections fix the maximum duration of any suspension (Ed. Code, § 10607) and certain conditions precedent to a suspension for more than 20 days (Ed. Code, § 10607.5).

The governing board of a school district may suspend or expel any pupil "who refuses or neglects to obey any rules prescribed pursuant to [section 1052]." (Ed. Code, § 10604.3.)

The governing board may suspend or expel pupils for misconduct. (Ed. Code, § 10605.)

If a pupil is expelled from school, the parent or guardian may appeal to the county board of education which is then required to hold a hearing. (Ed. Code, § 10608.)

We conclude that the authority of the governing board to remove a child from public school, over parental objection, on grounds of the child's physical or mental disability is limited to those cases where the

child's attendance would "be inimical to the welfare of other pupils." (Ed. Code, § 10553.)

Defendant cites *In re Shinn,* 195 Cal.App.2d 683, 693 [16 Cal.Rptr. 165] in support of its contention that "the question of exemption [under Ed. Code, § 12152] [is] one for the determination of the proper school authorities and not by the parents." Reliance on *In re Shinn, supra,* is misplaced. The case did not involve an involuntary removal; instead, the parents had removed their children from school in violation of the compulsory attendance law, without having sought or obtained an exemption. In a juvenile proceeding wherein the children were made wards of the court and the parents ordered to deliver them to school, the juvenile court had found that no grounds for exemption existed. The court in *In re Shinn, supra,* in the passage relied on by respondent, was merely emphasizing that the ultimate decision of whether to *grant* an exemption pursuant to 12152 was for the school authorities. (*Id.,* at p. 693.)

The parents may not withhold a child's attendance without seeking an exemption, and furnishing the governing board of the school district with satisfactory evidence of the condition upon which the exemption is sought. Section 12152 gives the governing board the discretion to grant or deny the exemption.

Having concluded that Education Code section 12152 does not establish grounds for involuntary removal or exclusion of a child from public school, we must now consider whether the action of the district may be sustained under its authority to exclude pursuant to Education Code section 10553. We find that it may not.

Such exclusion is authorized only where the child's mental or physical condition causes the child's attendance to be inimical to the welfare of other children. The action of the district in excluding plaintiff was fatally defective in that no consideration was given to the question of whether Cherie's attendance was inimical to the welfare of other children. Although it is unnecessary, in view of this defect, to consider the quality of the evidence relating to her mental or physical condition, the findings of the trial court, amply supported by the evidence, make it clear that Cherie's exclusion was not predicated upon any finding regarding her mental or physical condition.

There was evidence that she was truant, and that she had committed acts that might properly subject her to disciplinary measures, but there was no evidence relating to her current mental or physical condition. The trial court found that the persons recommending exemption had no information from a physician, a psychologist or a psychiatrist relating to Cherie's mental condition. It is true that the code does not require a physician's certificate. That requirement, once included in Education Code section 12152, was deleted, and section 10553 never imposed such a condition. However, both sections require a showing of mental or physical disability.

It may well be that a school psychologist or an educator who specializes in child welfare and attendance is also qualified to determine whether a child has a mental disability. However, no such determination was made in the case of Cherie Abella.

In this regard the trial court found as follows:

"Prior to the exemption of Cherie Abella, she received no counselling from the School Counselor or School Psychologist, . . ."

"Telford Moore [school psychologist] did not recommend for or against the exemption . . . . He had not psychologically evaluated Cherie Abella prior to the decision to exempt her."

"The decision to exempt Cherie Abella was made prior to the involvement of Hazel Russell [consultant, child welfare and attendance office]. When Hazel Russell signed the exemption card she had never spoken to Cherie Abella, other than to say hello, and had no personal knowledge leading to the exemption. Hazel Russell Did [sic] not believe Cherie Abella had a mental condition which rendered it inadvisable for her to attend school at the time she signed the exemption card."

"Edna Lockhart [director, child welfare and attendance] was not present at either of the meetings at which Cherie Abella was discussed, and Mrs. Lockhart had no contact with Cherie Abella nor any member of Cherie Abella's family prior to signing the exemption card."

"Albert Marley [assistant superintendent] was not consulted and did not discuss the exemption of Cherie Abella with anyone prior to the decision to exempt Cherie Abella. . . . He did not feel that Cherie Abella

was either a behavior problem nor that her attendance was inimical to the welfare of other children when he signed the exemption card. . . ."

These are the people from the school district, in addition to Mr. Bell, the principal of the school, and Virginia Brauner, dean of students, who signed the card which excluded Cherie Abella from school attendance for five months. The court made no finding of fact regarding the knowledge of Mr. Bell and Mrs. Brauner.

The court did make the following "finding on the issues:"

"Cherie Abella was exempted from attendance in the District because District personnel felt that Cherie was a *behavior problem* and they also believed that she had a mental condition which rendered it inadvisable for her to attend school." (Italics added.)

In view of the trial court's finding that Cherie was exempted because she was a behavioral problem, and in the absence of any evidence regarding her current mental or physical disability, we must conclude that Cherie Abella was in fact excluded from school for disciplinary reasons.

The school district does have the authority to maintain discipline in the schools, and to that end may suspend or expel a pupil who refuses or neglects to obey any rules prescribed pursuant to Education Code section 1052 (Ed. Code, § 10604.3), and the governing board may suspend or expel for misconduct (Ed. Code, § 10605) according to the procedure heretofore described. However, such authority must be exercised in a manner that will satisfy the statutory and constitutional standards for disciplinary proceedings.

2. The procedure followed by defendant school district in excluding children from school attendance under Education Code section 12152 denied those children due process of law.

The opportunity for instruction at public expense is provided by the laws of this state in response to the mandate of the state Constitution. (Cal. Const., art. IX, §§ 1, 5 (1879).)

The importance of this right has been repeatedly emphasized by the California Supreme Court. In *Piper* v. *Big Pine School Dist.,* 193 Cal. 664, 670 [226 P. 926], the court stated that the right of a child to attend

school is "a right—a legal right—as distinctively so as the vested right in property owned is a legal right, and as such it is protected, and entitled to be protected by all the guarantees by which other legal rights are protected . . . ."

In *Serrano* v. *Priest,* 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241], the court reaffirmed the fundamental nature of that right as follows: "We are convinced that the distinctive and priceless function of education in our society warrants, indeed compels, our treating it as a 'fundamental interest.' " (*Id.,* at pp. 608-609.)

In affirming a judgment compelling a school board to provide bus service to children in a remote country area, the California Supreme Court described the court's duty in language most appropriate to the case at hand: "In light of the public interest in conserving the resource of young minds, we must unsympathetically examine any action of a public body which has the effect of depriving children of the opportunity to obtain an education." (*Manjares* v. *Newton,* 64 Cal.2d 365, 376 [49 Cal.Rptr. 805, 411 P.2d 901].) It is in this spirit that we must examine the action of the respondent district in excluding Cherie Abella from University Heights Middle School for a period of five months during her eighth grade year.

■ Unquestionably, denial of instruction at public expense—a fundamental right—requires a due process hearing. The United States Supreme Court has held that where a state has established and maintained a public school system, "the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause." (*Goss* v. *Lopez,* 419 U.S. 565, 574 [42 L.Ed.2d 725, 734-735, 95 S.Ct. 729, 736]; see also *Charles S.* v. *Board of Education,* 20 Cal.App.3d 83 [97 Cal.Rptr. 422].)

The state Legislature has been zealous in establishing precise standards and procedural safeguards to insure that children are not arbitrarily denied their right to a free public education without due cause and an opportunity to be heard. (See Ed. Code, §§ 10551-10611.) However, the use of the "exemption procedure" to exclude a child for a behavior problem has denied the plaintiff and those similarly situated the protection afforded by those statutes.

Although the procedures necessary to satisfy the requirements of due process are not inflexible and universally applicable, they at least require notice and an opportunity for a hearing appropriate to the nature of the case. "[A] right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to . . . acquiesce or contest." (*Mullane* v. *Central Hanover Tr. Co.,* 339 U.S. 306, 314 [94 L.Ed. 865, 873, 70 S.Ct. 652, 657].) At the very minimum, therefore, students who are threatened with removal from school, depriving them of the fundamental right to a publicly financed education, are entitled to notice of the grounds for the removal and an opportunity to be heard. (*Goss* v. *Lopez, supra,* 419 U.S. 565, 579 [42 L.Ed.2d 725, 737, 95 S.Ct. 729, 738].)

■ Defendant district argues that the changes in the district's regulations have overcome any constitutional objection that may have previously existed in the exemption procedure. The regulations adopted in May of 1974 provide for involuntary exemption of pupils with a physical, "*behavioral* or emotional disorder coming under section 12152 of the Education Code . . . ." (Italics added.) The new regulations provide for the presence of a child's parent on the screening committee, and for an appeal to the board of education if the parent or guardian is not in agreement with the exemption plan.

Certainly under its rule-making power the school board may expand the grounds for removal for the purpose of maintaining discipline in the schools. (Ed. Code, § 1052.) However, in the exercise of that power the governing board must meet constitutional standards of reasonableness. (*Myers* v. *Arcata etc. School Dist.,* 269 Cal.App.2d 549, 558 [75 Cal.Rptr. 68].)

What the district has attempted by these regulations is to authorize an indefinite exclusion based upon a physical, *behavioral* or emotional disorder which prevents, or renders *inadvisable* attendance at school or application to study.

The "rule" here enunciated is so vague and standardless that the parent would be without any opportunity to refute the "charge." Without such opportunity to challenge the grounds for removal, the parents' participation and right of appeal is meaningless.

■ "Civil as well as criminal statutes must be sufficiently clear as to give a fair warning of the conduct prohibited, and they must provide a

standard or guide against which conduct can be uniformly judged by courts and administrative agencies." (*Morrison* v. *State Board of Education,* 1 Cal.3d 214, 231 [82 Cal.Rptr. 175, 461 P.2d 375].) This constitutional standard has been applied to regulations established by school districts, the violation of which result in suspension or expulsion. In *Myers,* the court held a school regulation prohibiting "extremes of hairstyles" to be unconstitutionally vague. "The importance of an education to a child is substantial [citations], and the state cannot condition its availability upon compliance with an unconstitutionally vague standard of conduct." (*Myers* v. *Arcata etc. School Dist., supra,* 269 Cal.App.2d at p. 560.) In a similar case the term "misconduct" was held to violate the due·process clause of the Fourteenth Amendment by reason of its vagueness. (*Soglin* v. *Kauffman* (W.D.Wis. 1968) 295 F.Supp. 978, 991.)

■ Certainly the word "inadvisable" is far less susceptible to precise definition than the word "extreme" condemned in the *Arcata School District* case. We do not here consider whether the word "inadvisable" ·as used in Education Code section 12152 provides a sufficient standard when the statute is applied in conformity with its legislative objectives. The Legislature in enacting the exemption provision used the word judiciously, as a control to be exercised by the governing board when parents seek to remove a child from public school attendance. We do find it to be unconstitutionally vague when used as the sole standard for involuntary exclusion, as the governing board has attempted in these regulations.

■ 3. The other principal issue raised in this appeal is whether the complaint states facts sufficient to constitute a proper class action under Code of Civil Procedure section 382.

The trial court's determination in this respect is ambiguous. Included in the findings of fact and conclusions of law is the finding that the students who have been exempted from attending school lack a sufficient community of interest in the facts of their cases for the action to constitute a proper class action. However, the judgment, in declaring that there had been no denial of due process or equal protection of the law does refer to "Cherie Abella, and those she represents."

Because we conclude on other grounds that this is not a proper class action, and that the judgment must be reversed, it is unnecessary to

resolve the apparent conflict between the findings of fact and conclusions of law and the judgment.

Code of Civil Procedure section 382 reads in relevant part as follows: ". . . and when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

While it appears that there was an ascertainable class and that there were common questions of law and fact by the standards discussed in *Daar* v. *Yellow Cab Co.,* 67 Cal.2d 695, 704 [63 Cal.Rptr. 724, 433 P.2d 732], the record is silent with respect to the following:

1. The impracticability of bringing all members of the class before the court;

2. Whether common questions of fact predominated over unique questions affecting individual members only;

3. The form of notice to be given other members of the class; and

4. Plaintiff's adequacy to fairly represent the class, particularly with respect to the issue of tutoring, since plaintiff was returned to school before trial.

Resolution of these questions is a prerequisite to the determination of whether this action is a proper class action. (*Bauman* v. *Islay Investments,* 45 Cal.App.3d 797, 801-802 [119 Cal.Rptr. 681]; *Home Sav. & Loan Assn.* v. *Superior Court,* 42 Cal.App.3d 1006, 1010 [117 Cal.Rptr. 485].)

It also appears that the determination of this appeal will resolve the common issues to the benefit of all members of the class. (See *Bozung* v. *Local Agency Formation Com.,* 13 Cal.3d 263, 273 [118 Cal.Rptr. 249, 529 P.2d 1017].) Therefore, to the extent that the action would have been maintainable as a class action, the matter is moot.

In view of our determination that Education Code section 12152 grants the district no authority to exclude, it is unnecessary to consider plaintiff's contention that the school district has a duty to provide tutoring to children who are involuntarily excluded pursuant to that section.

There is no evidence that Cherie is in need of tutoring as a result of any past exclusionary action.

In all other respects the judgment is reversed, and the cause is remanded to the superior court for proceedings consistent with this opinion.

Kaufman, Acting P. J., and McDaniel, J., concurred.