[No. B192878. Second Dist., Div. Three. Aug. 8, 2008.]

JONATHAN L. et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES et al., Real Parties in Interest.

1078

COUNSEL

Children's Law Center of Los Angeles, Cameryn Schmidt, Christine Caldwell, Patricia G. Bell, Diana Rodriguez; and Lori A. Fields for Petitioners Jonathan L. and Mary Grace L.

Aida Aslanian for Real Party in Interest Mother, Mary L.

United States Justice Foundation, Gary G. Kreep; Alliance Defense Fund, Timothy D. Chandler, Jeffrey A. Shafer; and Christopher Blake for Real Party in Interest Father Phillip L.

Raymond G. Fortner, Jr., County Counsel, James M. Owens and Larry Cory, Assistant County Counsel, and Judith A. Luby, Deputy County Counsel, for Real Party in Interest Los Angeles County Department of Children and Family Services.

No appearance for Respondent.

Pacific Justice Institute, Kevin T. Snider, Brad W. Dacus, Karen D. Milam and Matthew B. McReynolds for Sunland Christian School as Amicus Curiae.

Sharon L. Browne and Damien M. Schiff for Pacific Legal Foundation, Kent Hayes and Anne Hayes as Amici Curiae.

Jay Alan Sekulow, Stuart J. Roth, Colby M. May, James M. Henderson and Walter M. Weber for American Center for Law & Justice as Amicus Curiae.

Dean R. Broyles and James M. Griffiths for Western Center for Law & Policy as Amicus Curiae.

Richard D. Thorn for American Civil Rights Union as Amicus Curiae.

Jason R. Craddock for Christian Leaders as Amicus Curiae.

Dickenson, Peatman & Fogarty and Matt Eisenberg for Jewish Homeschoolers of Napa and Sonoma Counties as Amicus Curiae.

Baker & McKenzie, Tod L. Gamlen, Gerald M. Salcido, George Kimball, Stefan R. Spich and Erik C. Mazza for California Homeschool Network as Amicus Curiae.

Wilson Sonsini Goodrich & Rosati, Douglas J. Clark, Diane M. Walters, Benjamin M. Crosson and Crystal M. Gaudette for Homeschool Association of California as Amicus Curiae.

Munger, Tolles & Olson, Kristin L. Myles, James C. Rutten and Victoria L. Boesch for Christian Home Educators Association of California as Amicus Curiae.

Bingham McCutchen, John Reese, Thomas S. Hixson and Tanya K. Dumas for Gifted Homeschoolers Forum as Amicus Curiae.

Morrison & Foerster and Sean P. Gates for Grace Christian Academy as Amicus Curiae.

GCA Law Partners and Deborah R. Schwarzer for Arbor Academy, Beach High School, Excellence In Education, AtoZ Home's Cool, Homefires-Journal of Homeschooling Online and Northern California African American Homeschooler's Association as Amici Curiae.

J. Michael Smith, Darren A. Jones and Michael P. Farris for Home School Legal Defense Association, Focus on the Family and Private and Home Educators of California as Amici Curiae.

John C. Eastman and David L. Llewellyn, Jr.; and Erwin Chemerinsky for Center for Constitutional Jurisprudence as Amicus Curiae.

Freedom Law Group, Nicholas P. Miller and Alan J. Reinach for Seventh-day Adventist Church State Council as Amicus Curiae.

Goodwin Procter, Brooks R. Brown, Michelle Gonnam and John Affeldt for Public Advocates, Inc. as Amicus Curiae.

Brian R. Chavez-Ochoa for National Legal Foundation as Amicus Curiae.

Daniel E. Witte for Sutherland Institute as Amicus Curiae.

Priscilla S. Winslow for California Teachers Association as Amicus Curiae.

Liberty Counsel, Mary E. McAlister, Mathew D. Stayer, Anita L. Stayer and Sarah E. Seitz for Members of United States Congress as Amici Curiae.

Edmund G. Brown, Jr., Attorney General, Douglas M. Press, Assistant Attorney General, Karin S. Schwartz and Gregory D. Brown, Deputy Attorneys General, for the Governor of the State of California and the Attorney General of the State of California as Amici Curiae.

Marsha A. Bedwell, Amy B. Holloway and Michael E. Hersher for Superintendent of Public Instruction and the California Department of Education as Amici Curiae.

Jess Womack, Rochelle J. Montgomery, Kelly R. Barnes; Fagen Friedman & Fulfrost, Howard Friedman and Emilia C. Huntley for Los Angeles Unified School District as Amicus Curiae.

---

**OPINION**

**CROSKEY, J.**—In this dependency case, we consider the legality of, and restraints upon, home schooling in California.[1] We will conclude that: (1) California statutes permit home schooling as a species of private school education; and (2) the statutory permission to home school may constitutionally be overridden in order to protect the safety of a child who has been declared dependent.

As indicated, these issues arise in the course of a dependency proceeding. The family in this case had a history of dependency court proceedings involving charges of physical abuse, neglect, and failure to prevent sexual abuse. After the two youngest children were declared dependent due to the abuse and neglect of their siblings, their attorney sought an order that they be sent to private or public school, rather than educated at home by their mother, so that they would be in regular contact with mandatory reporters of abuse and neglect.[2] The dependency court declined to issue such an order, primarily based on its view that parents have an absolute constitutional right to home school their children.

The children's counsel sought relief in this court by a petition for an extraordinary writ. We filed our original opinion on February 28, 2008, granting the petition on the bases that (1) California statutory law does not permit home schooling; and (2) this prohibition does not violate the United

---

[1] We use the terms "home school" and "home schooling" to refer to full-time education in the home by a parent or guardian who does not necessarily possess a teaching credential.

[2] Mandatory reporters have a duty to report suspected child abuse or neglect. (Pen. Code, § 11166.) Teachers and teacher's aides in public and private schools are mandatory reporters. (Pen. Code, § 11165.7, subd. (a)(1), (3).)

States Constitution. We subsequently granted the father's petition for rehearing on March 25, 2008, in order to provide an opportunity for further argument on the multiple complex issues involved in this case, including, but not limited to (1) additional California statutes that might bear upon the issue; and (2) potentially applicable provisions of the California Constitution. We also invited a number of governmental and private parties to submit amicus curiae briefs.[3]

It is important to recognize that it is not for us to consider, as a matter of policy, whether home schooling *should* be permitted in California. That job is for the Legislature. It is not the duty of the courts to make the law; we endeavor to interpret it. (Cf. *In re Marriage Cases* (2008) 43 Cal.4th 757, 780 [76 Cal.Rptr.3d 683, 183 P.3d 384].)

Our first task, interpreting the law of California, is made more difficult in this case by legislative inaction. As we will discuss at length below, home schooling was initially *expressly permitted* in California, when the compulsory education law was enacted in 1903. In 1929, however, home schooling was amended out of the law, and children who were not educated in public or private schools could be taught privately *only* by a credentialed tutor. Case law in 1953 and 1961 confirmed this interpretation, and specifically concluded that a home school could not be considered a private school. While the Legislature could have amended the statutes in response to these cases, to expressly provide that a home school could be a private school, it did not do so.

Thus, as of that time, given the history of the statutes and the Legislature's implied concurrence in the case law interpreting them, the conclusion that home schooling was not permitted in California would seem to follow. However, subsequent developments in the law call this conclusion into question. Although the Legislature did not amend the statutory scheme so as to expressly permit home schooling, more recent enactments demonstrate an

---

[3] We have received and considered amicus curiae briefs from the following entities: (1) Sunland Christian School; (2) the Sutherland Institute; (3) Pacific Legal Foundation, Kent Hayes and Anne Hayes; (4) California Homeschool Network, Homeschool Association of California, and Christian Home Educators Association of California; (5) Los Angeles Unified School District; (6) American Center for Law & Justice, American Civil Rights Union, Christian Leaders, Jewish Homeschoolers of Napa & Sonoma Counties, and Western Center for Law & Policy; (7) the Superintendent of Public Instruction and the California Department of Education; (8) the California Teachers Association; (9) Gifted Homeschoolers Forum, Grace Christian Academy, Arbor Academy, Beach High School, Excellence In Education, AtoZ Home's Cool, Homefires-Journal of Homeschooling Online, and Northern California African American Homeschooler's Association; (10) the Governor and Attorney General of the State of California; (11) Public Advocates, Inc.; (12) the Home School Legal Defense Association, Focus on the Family, and Private and Home Educators of California; (13) members of the United States Congress; (14) the Seventh-day Adventist Church State Council; (15) the National Legal Foundation; and (16) the Center for Constitutional Jurisprudence.

apparent acceptance by the Legislature of the proposition that home schooling is taking place in California, with home schools allowed as private schools. Recent statutes indicate that the Legislature is *aware* that some parents in California home school their children by declaring their homes to be private schools. Moreover, several statutory enactments indicate a legislative *approval* of home schooling, by exempting home schools from requirements otherwise applicable to private schools.

We are therefore confronted with (1) compulsory education statutes, which were apparently intended to *eliminate* the permission previously granted to home school; and (2) later enactments, which reflect the Legislature's understanding that the compulsory education statutes *permit* home schooling, as a species of private school education. Under these circumstances, it is our view that the proper course of action is to interpret the earlier statutes in light of the later ones, and to recognize, as controlling, the Legislature's apparent acceptance of the proposition that home schools are permissible in California when conducted as private schools.

This conclusion, however, does not resolve all of the issues before us. California statutes also permit a dependency court to issue any reasonable orders for the care of a dependent child, including orders limiting the right of the parents to make educational decisions for the child. Because the United States Supreme Court has held that parents possess a constitutional right to direct the education of their children, it is argued that any restriction on home schooling is a violation of this constitutional right. We disagree. We conclude that an order requiring a dependent child to attend school outside the home in order to protect that child's safety is *not* an unconstitutional violation of the parents' right to direct the education of their children. The constitutionality of any other restriction on home schooling (see fn. 35, *post*), including a prohibition on home schooling in its entirety, is not before us in this case.

### FACTUAL AND PROCEDURAL BACKGROUND[4]

This case involves a dependency petition filed with respect to three children in the L. family: Rachel, born 1991; Jonathan, born 1997; and Mary Grace, born 1999. This was not the first time mother Mary L. (mother) and father Philip L. (father) had been involved in the dependency system. Indeed, the family has required the repeated intervention of the Los Angeles County Department of Children and Family Services (DCFS) over the past 20 years.

---

[4] In certain respects, we rely upon our unpublished opinion in a related appeal, *In re Rachel L.* (Nov. 20, 2007, B192601, B195484) as the record in that appeal was more detailed than the record in this writ proceeding.

### 1. *General Background*

The intervention began in 1987, when father physically abused his eldest daughter. She was not adjudicated dependent, however, as she went to live with her mother in order to avoid further abuse from father. Father next physically abused a second daughter. She was declared dependent due to physical abuse and taken from the parents' custody. Father continued his abusive behavior, and, in the instant proceeding, Rachel was declared dependent due to physical abuse by him. Throughout this time, mother was aware of the physical abuse, yet failed to protect the children.[5] It was not alleged that father physically abused Jonathan and Mary Grace; they were declared dependent in the instant case due to the abuse of their siblings.

Throughout the instant dependency proceeding, the parents have been uncooperative. When Jonathan and Mary Grace were ordered detained, mother fled and attempted to hide the children from the authorities. When she subsequently appeared in court with the children, Jonathan and Mary Grace were released to the parents' custody on the condition that the parents cooperate in the case. Specifically, the parents were directed to allow the social workers and the attorney appointed for the children to interview the children without the parents being present and to visit the children in the home to update the court on their condition. Nonetheless, the parents limited the social workers' access to Jonathan and Mary Grace, and coached the children not to talk with the social workers.[6]

### 2. *Home Schooling*

The issue of home schooling arose in this case because Rachel, who was home schooled by mother, believed she should attend public school. DCFS amended the petition to allege that Rachel was dependent on the additional basis that the parents' refusal to send her to public school placed her at risk of serious emotional damage.

Evidence elicited on the subject revealed the following facts. All eight of the family's children have been home schooled. Mother, who had completed 11th grade, was the primary teacher. The children worked from "education

[5] Additionally, a previous dependency proceeding was based on the sexual abuse of one of the parents' daughters. Leonard C., a frequent visitor to the household, was considered a possible perpetrator of the abuse and the parents were directed not to allow him in the home. The parents complied, but once the petition had been dismissed, the parents allowed Leonard C. to return, whereupon he sexually abused Rachel. The parents' failure to protect Rachel from this sexual abuse was another basis for her dependency.

[6] It also appears that, after the entry of the orders at issue in this writ petition, father coached the children not to speak with their attorney.

packs," which were prepared educational materials in different subjects. Mother would give the children assignments from their workbooks, and they would read in the book and fill out the necessary worksheets.[7] If the children needed help with a particular assignment, they would ask mother, who would further explain to them. Sometimes the older children helped the younger ones with their work. The evidence was in dispute as to the number of hours the children were home schooled per day, and the subjects taught.

The children were home schooled through Sunland Christian School (Sunland).[8] Sunland is a private school that teaches via independent study in the students' homes. According to a declaration subsequently filed by Terry Neven, the principal of Sunland, Sunland interviews and supervises all parents to make certain that they are capable of teaching.[9] Sunland requires the parents to teach for at least three hours per day for 175 days per year, although "[t]he parent/teacher is required to continue the school day until the appropriate amount of work is completed per student."

The results of the parents' home schooling of their children were mixed. One of Rachel's older sisters had graduated from Sunland and intended to attend college. Another sister had completed Sunland but failed to graduate, receiving only a certificate of completion. The record also contained evidence of Rachel's most recent scores on a standardized test, which indicated that she was achieving at or near grade level in some subjects, and substantially below grade level in others.

### 3. *Trial Court Rulings*

After hearing the evidence and considering additional briefing on the issue, the dependency court dismissed the allegation of the petition asserting that Rachel was dependent due to the parents' failure to send her to public school.

---

[7] The worksheets would be copied on a photocopier and the children would work on the copies. In this way, the younger children could use the same workbooks the older children had used. The dependency court noted that the family was using education packs with copyright dates of 1978 and 1979.

[8] Sunland sought permission to intervene as a party in this proceeding. We denied permission to intervene on the basis that dependency matters are special proceedings governed by their own rules and procedures, and there is no authority permitting a third party with no interest in the child to intervene in a dependency matter. We granted Sunland amicus curiae status, however, so that it could brief all relevant issues in this case. We also permitted Sunland to file responsive briefs to any other amicus curiae briefs filed, a permission granted to the parties in the case but to no other amici curiae.

[9] At oral argument following our order granting father's petition for rehearing in the instant proceeding, counsel for Sunland represented that Sunland had not provided the out-of-date materials to mother and father, and that, instead, the parents had those materials before they enrolled their children in Sunland. Yet, in Sunland's May 30, 2008 reply letter brief, Sunland states that it "ensures greater uniformity in that [it] provides curriculum [and] lesson plans."

While the court expressed some concerns regarding the legality and efficacy of the parents' home schooling,[10] the court could not conclude that the education Rachel was receiving was so poor as to create a serious risk of emotional damage.

However, all three children were declared dependent on other grounds (namely, the physical and sexual abuse of Rachel). Therefore, the court proceeded to a disposition hearing. The court indicated its intended disposition was for Rachel to be suitably placed,[11] but for Jonathan and Mary Grace to remain at home.

Counsel for Jonathan and Mary Grace then sought an order that the children be sent to private or public school, as a matter of *safety*.[12] Counsel argued that, given the history of abuse in the family, and the parents' continued refusal to allow the children to speak freely with social workers, it was necessary for the children to attend a school where they would have regular contact with mandatory reporters of child abuse.

The court declined to enter the order, stating that it did not want to deprive the parents of their "constitutional right to educate their own children." However, the court was concerned that the parents' home schooling of the children might not meet all necessary legal requirements, and therefore ordered that the local school district be asked to "come out and investigate[] the appropriateness of the home-schooling."[13]

A progress hearing was held approximately one month later.[14] A representative of the school district had been denied entry into the home by the parents, but had received documentation from Sunland and seemed satisfied by it. At the hearing, counsel for Jonathan and Mary Grace again renewed the request for the children to be educated "outside of the home to ensure their physical and emotional safety." Again, the court denied the request based on

---

[10] The court was particularly concerned with the outdated materials used, and indicated an intention to order the parents to update their education packs.

[11] Rachel was placed with an older sister. She has since run away; her whereabouts are unknown.

[12] When a child is adjudicated dependent, the dependency court has broad discretion to make any reasonable orders for the care and support of the child, specifically including orders limiting the right of the parents to make educational decisions for the child. (Welf. & Inst. Code, §§ 245.5, 361, subd. (a), 362, subds. (a), (d); *In re Eric B.* (1987) 189 Cal.App.3d 996, 1006 [235 Cal.Rptr. 22].)

[13] As we will discuss below, there does not appear to be any statutory authority for a local school district to investigate any particular home school for the purpose of determining the adequacy of its educational activities.

[14] Parents had, by this time, updated their educational materials for Jonathan and Mary Grace.

its belief that the parents' home schooling of the children was *legal*, without considering the safety issue raised by counsel.

Counsel for Jonathan and Mary Grace filed the pending petition for an extraordinary writ challenging the trial court's refusal to order the children to attend private or public school for their safety.[15]

## ISSUES BEFORE THIS COURT

■ As the trial court's ruling was based in part on its understanding that the parents' home schooling in this case was largely in compliance with the law, we first consider whether home schooling is permitted under California statutes. We conclude that it is.

■ Next, we consider the order requested by counsel for Jonathan and Mary Grace in this case. Specifically, it is undisputed that a dependency court has the statutory authority to order that a dependent child attend school if within the best interests of the child's safety. It is argued that this restriction is an unconstitutional violation of parents' right to direct the education of their children.[16] We conclude that the restriction is constitutional.

## DISCUSSION

1. *California Law Regarding Home Schooling*

 a. *Law of Statutory Interpretation*

■ We first determine whether, and under what circumstances, California law permits home schooling. We consider and interpret the relevant provisions of the Education Code. "When construing a statute, we must 'ascertain

---

[15] After we held oral argument on the petition for rehearing, the dependency court issued an order terminating jurisdiction over the two children at issue in this writ proceeding. Counsel for the children has filed a notice of appeal from that order. Father has filed a motion to dismiss the current writ petition on the basis of mootness. That motion was denied concurrently with the filing of this opinion. This case is not moot. Not only are the issues that may be raised by the appeal from such termination order not yet before us, the currently pending petition raises issues of continuing public interest which are likely to recur, permitting the court to exercise its discretion to decide the matter on the merits in the interest of public policy and clarification of the law. (*Black Diamond Asphalt, Inc. v. Superior Court* (2003) 114 Cal.App.4th 109, 115 [7 Cal.Rptr.3d 466]; *In re Christina A.* (2001) 91 Cal.App.4th 1153, 1158 [111 Cal.Rptr.2d 310].) This is particularly so in this case, where father obtained the termination order *after* the issuance of the original appellate opinion, a grant of rehearing, and oral argument thereon. (*Rosales v. Thermex-Thermatron, Inc.* (1998) 67 Cal.App.4th 187, 191, fn. 1 [78 Cal.Rptr.2d 861]; *Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 300, fn. 4 [106 Cal.Rptr.2d 906]; *Lucich v. City of Oakland* (1993) 19 Cal.App.4th 494, 502 [18 Cal.App.4th 1160, 23 Cal.Rptr.2d 27, 23 Cal.Rptr.2d 450].)

[16] An argument based on the First Amendment right to free exercise of religion is also raised. (See fn. 32, *post*.)

the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.] The words of the statute are the starting point. 'Words used in a statute . . . should be given the meaning they bear in ordinary use. [Citations.] If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . .' [Citation.] If the language permits more than one reasonable interpretation, however, the court looks 'to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' [Citation.] After considering these extrinsic aids, we 'must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' " (*Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 977–978 [90 Cal.Rptr.2d 260, 987 P.2d 727].)

The Education Code itself provides that "its provisions . . . are to be liberally construed, with a view to effect its objects and to promote justice." (Ed. Code, § 2.)

### b. *The California Constitution*

Any discussion of education in California must begin with California's Constitution. California Constitution, article IX, section 1 provides, "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the Legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement." The state is responsible for educating all California children.[17] (*Butt v. State of California* (1992) 4 Cal.4th 668, 674 [15 Cal.Rptr.2d 480, 842 P.2d 1240].) Education plays an indispensable role in the modern state. "This role, we believe, has two significant aspects: first, education is a major determinant of an individual's chances for economic and social success in our competitive society; second, education is a unique influence on a child's development as a citizen and his participation in political and community life." (*Serrano v. Priest* (1971) 5 Cal.3d 584, 605 [96 Cal.Rptr. 601, 487 P.2d 1241].) It is "the lifeline of both the individual and society." (*Ibid.*)

---

[17] We take judicial notice that there are over 6.2 million students in California's public schools, being educated at an annual cost of over $50 billion. There are over 500,000 students in California's private schools. (Evid. Code, § 452, subd. (h); Cal. Dept. of Education, State of Cal. Education Profile 2006-2007 <http://www.ed-data.k12.ca.us/profile.asp?level=04&reportNumber=16> [as of Aug. 8, 2008]; Cal. Dept. Education, Statewide Totals and Averages for School Districts Fiscal Year: 2006-07 <www.ed-data.k12.ca.us/finance/FinanceReportForState_districts.asp> [as of Aug. 8, 2008].) In contrast, it is estimated that there are approximately 166,000 students being home schooled in California. (Amicus curiae brief of Gifted Homeschoolers Forum et al.)

In addition to the political and economic contributions of education, there is also a social dimension to the state's interest in education. (*Hartzell v. Connell* (1984) 35 Cal.3d 899, 907 [201 Cal.Rptr. 601, 679 P.2d 35].) "[E]ducation serves as a 'unifying social force' among our varied population, promoting cohesion based upon democratic values. [Citations.] The public schools bring together members of different racial and cultural groups and, hopefully, help them to live together ' "in harmony and mutual respect." ' " (*Id.* at p. 908.) "In addition to the particular skills taught, group activities encourage active participation in community affairs, promote the development of leadership qualities, and instill a spirit of collective endeavor. These results are directly linked to the constitutional role of education in preserving democracy, as set forth in article IX, section 1 . . . ." (*Id.* at p. 911.)

### c. *Compulsory Education Law*

California satisfies its obligation to educate its children by means of the compulsory education law. Education Code section 48200 provides as follows: "Each person between the ages of 6 and 18 years not exempted under the provisions of this chapter . . . is subject to compulsory full-time education. Each person subject to compulsory full-time education . . . shall attend the public full-time day school . . . for the full time designated as the length of the schoolday by the governing board of the school district in which the residency of either the parent or legal guardian is located and each parent, guardian, or other person having control or charge of the pupil shall send the pupil to the public full-time day school . . . for the full time designated as the length of the schoolday by the governing board of the school district in which the residence of either the parent or legal guardian is located."[18] Exemptions

---

[18] On the complaint of any person, the governing board of a school district shall make a full and impartial investigation into all charges that a parent having control of a child has failed to comply with the compulsory education law. (Ed. Code, § 48290.) If it appears that the parent has committed a violation, the secretary of the board (or the attendance supervisor) shall refer the parent to a school attendance review board. (Ed. Code, §§ 48291, 48292.) If the parent still continually and willfully fails to comply, the school attendance review board shall direct the school district to file, in the proper court, a criminal complaint charging the violation, and see that the charge is prosecuted by the proper authority. (Ed. Code, § 48291.) Any parent who fails to comply with the compulsory education law, unless excused or exempt, is guilty of an infraction. (Ed. Code, § 48293, subd. (a).) The first conviction results in a fine of no more than $100; the penalty for a second conviction is a fine of no more than $250. Subsequent convictions can result in a fine of up to $500. In lieu of fines, the court may order participation in a parent education and counseling program. (*Ibid.*) The court may also order that the person convicted of the violation immediately enroll or reenroll the pupil in the appropriate school and provide proof of enrollment. Willful failure to comply is punishable as civil contempt with a fine of up to $1,000. (Ed. Code, § 48293, subd. (c).)

There are also provisions relating to the truancy of a child who fails to attend school as required, which could culminate with a declaration that the child is a ward of the juvenile court under Welfare and Institutions Code section 601. (Ed. Code, § 48264.5, subd. (d).)

are set forth in the following sections. (Ed. Code, § 48220 et seq.) There are two exemptions relevant to this case: the private school exemption and the private tutor exemption.[19]

### (1) Private School Exemption

The exemption for private school students is found in Education Code section 48222. That section provides, "Children who are being instructed in a private full-time day school by persons capable of teaching shall be exempted. Such school shall . . . be taught in the English language and shall offer instruction in the several branches of study required to be taught in the public schools of the state. The attendance of the pupils shall be kept by private school authorities in a register, and the record of attendance shall indicate clearly every absence of the pupil from school for a half day or more during each day that school is maintained during the year. [¶] Exemptions under this section shall be valid only after verification by the attendance supervisor of the district, or other person designated by the board of education, that the private school has complied with the provisions of Section

---

[19] There are also some suggestions that the law regarding independent study may permit home schooling. Pursuant to Education Code section 51745, "the governing board of a school district or a county office of education may offer independent study to meet the educational needs of pupils in accordance with the requirements of this article." Independent study opportunities may include "[i]ndividualized alternative education designed to teach the knowledge and skills of the core curriculum." (Ed. Code, § 51745, subd. (a)(3).) A later statute refers to independent study "whether characterized as home study or otherwise." (Ed. Code, § 51747.3.) It is apparent, however, that independent study is permissible only when offered *by the public school system* and supervised *by a certificated teacher.* "The independent study by each pupil or student shall be coordinated, evaluated, and . . . shall be under the general supervision of an employee of the school district or county office of education who possesses a valid certification document pursuant to Section 44865 [a valid teaching credential based on a baccalaureate degree, student teaching, and special fitness to perform] or an emergency credential pursuant to Section 44300 [which also requires a baccalaureate degree], registered as required by law." (Ed. Code, § 51747.5, subd. (a).)

Similarly, the Department of Education's Web site explains, "Independent study is an alternative instructional strategy, not an alternative curriculum. Students work independently, according to a written agreement and under the general supervision of a credentialed teacher. While independent study students follow the district-adopted curriculum and meet the district graduation requirements, independent study offers flexibility to meet individual student needs, interests, and styles of learning." (<http://www.cde.ca.gov/sp/eo/is/> [as of Aug. 8, 2008].) Regulations governing independent study provide that the local districts participating in independent study should maintain records including "representative samples of each . . . student's work products bearing signed or initialed and dated notations by the supervising teacher indicating that he or she has personally evaluated the work, or that he or she has personally reviewed the evaluations made by another certificated teacher." (Cal. Code Regs., tit. 5, § 11703, subd. (b)(3).)

While it is clear that some form of home schooling may be permissible under these statutes, when the independent study is under the general supervision of a credentialed employee of the school district or county office of education, it is equally clear that the parents in this case were not engaging in this method of home schooling. They do not argue otherwise.

33190 requiring the annual filing by the owner or other head of a private school of an affidavit or statement of prescribed information with the Superintendent of Public Instruction.[20] The verification required by this section shall not be construed as an evaluation, recognition, approval, or endorsement of any private school or course."

 Education Code section 33190 requires "[e]very person, firm, association, partnership, or corporation offering or conducting private school instruction on the elementary or high school level" to, between October 1 and 15 of every year, "file with the Superintendent of Public Instruction an affidavit or statement, under penalty of perjury, by the owner or other head" setting forth certain information "for the current year." The information is to include "The address, including city and street, of every place of doing business of the person, firm, association, partnership, or corporation within the State of California" (Ed. Code, § 33190, subd. (b)); "The names and addresses, including city and street, of the directors, if any, and principal officers of the person, firm, association, partnership, or corporation" (Ed. Code, § 33190, subd. (d)); and "The school enrollment, by grades, number of teachers, coeducational or enrollment limited to boys or girls and boarding facilities" (Ed. Code, § 33190, subd. (e)). The affidavit must also contain a statement that "the following records are maintained at the address stated, and are true and accurate: [¶] (1) The records required to be kept by Section 48222. [¶] (2) The courses of study offered by the institution. [¶] (3) The names and addresses, including city and street, of its faculty, together with a record of the educational qualifications of each." (Ed. Code, § 33190, subd. (f).) The affidavit must also affirm that "[c]riminal record summary information has been obtained pursuant to Section 44237." (Ed. Code, § 33190, subd. (g).)

### (2) Private Tutor Exemption

The private tutor exemption is set forth in Education Code section 48224. That section provides, "Children not attending a private, full-time, day school and who are being instructed in study and recitation for at least three hours a day for 175 days each calendar year by a private tutor or other person in the several branches of study required to be taught in the public schools of this state and in the English language shall be exempted. The tutor or other person shall hold a valid state credential for the grade taught. The instruction shall be offered between the hours of 8 o'clock a.m. and 4 o'clock p.m."

 It cannot reasonably be argued that home schooling conducted by a parent who is *not* a certificated teacher satisfies the private tutor exemption

---

[20] We note here that the school district verifies only if a private school affidavit has been filed; the district is granted no authority by this provision to confirm that the private school is in compliance with the other requirements of the private school exemption.

from the compulsory education law.[21] The language of the statute is clear and unequivocal; it permits private education by a tutor, but only when the tutor holds "a valid state credential for the grade taught." Thus, we turn to the principal question in this case: whether a home school can be considered a private school.

> d. *Statutory Language Is Ambiguous on the Question of a Home School As a Private School*

The relevant provisions applicable to a private school exempt from compulsory public education students who are educated "in a private full-time day school by persons capable of teaching." We therefore consider whether a parent teaching a child in the home can constitute a "private full-time day school."

Home schooling advocates argue that there is nothing inherent in the word "school" (or the phrase "private . . . school") that precludes the possibility of a home school fitting within the word (or phrase). Others respond that if a home school can constitute a private school, there would be no reason for a separate private tutor exemption, as the use of a private tutor would *also* constitute a private school.

> (1) People v. Turner *and* In re Shinn

Courts, both in and out of California, have grappled with this question. The two California cases that have addressed the issue have concluded that a home school cannot constitute a private full-time day school. In *People v. Turner* (1953) 121 Cal.App.2d Supp. 861 [263 P.2d 685] (*Turner*), the court reasoned that if a private school encompassed a parent or tutor teaching at home, there would be no necessity for the private tutor exception. (*Id.* at p. Supp. 868.) *In re Shinn* (1961) 195 Cal.App.2d 683, 693 [16 Cal.Rptr. 165] (*Shinn*), relied on *Turner* to reach the same result.

> (2) *Approaches of Some Other State Courts*

Some other state courts have agreed with the rationale of *Turner*. (See *State v. Buckner* (Fla.Dist.Ct.App. 1985) 472 So.2d 1228, 1230; see also *In re Sawyer* (1983) 234 Kan. 436 [672 P.2d 1093, 1097] [concluding that, if a parent's purported instruction of children at home "will serve as a substitute for school, there is no compulsory school attendance"].) Others, however, have disagreed. The North Carolina Supreme Court considered whether a

---

[21] However, Sunland's claim that it required its home schooling parents to teach for three hours per day for 175 days each year strongly suggests that Sunland proceeded as though its home schooling parents were private tutors under this section.

home school could constitute a "school," or whether a "school" had to be an established institution. (*Delconte v. North Carolina* (1985) 313 N.C. 384 [329 S.E.2d 636, 642].) That court concluded, "We do not agree that the legislature intended simply by use of the word 'school,' because of some intrinsic meaning invariably attached to the word, to preclude home instruction." (*Ibid.*)

Similarly, the Indiana Appellate Court, in 1904, concluded that, "[a] school, in the ordinary acceptation of its meaning, is a place where instruction is imparted to the young. If a parent employs and brings into his residence a teacher for the purpose of instructing his child or children, and such instruction is given as the law contemplates, the meaning and spirit of the law have been fully complied with. This would be the school of the child or children so educated, and would be as much a private school as if advertised and conducted as such. We do not think that the number of persons, whether one or many, make a place where instruction is imparted any less or more a school." (*State v. Peterman* (1904) 32 Ind.App. 665 [70 N.E. 550, 551].)

It appears that the statutory language, standing alone, is ambiguous. The term "private full-time day school" could include home schools,[22] or it could refer solely to institutions outside the home, which we term "traditional private schools." We therefore turn to other indicia of legislative intent.

### e. *Legislative History*

We first consider the history of the compulsory education law and the private school exemption, to determine if it sheds any light on the Legislature's intent in enacting the exemption. The compulsory education law was initially enacted in 1903. (Stats. 1903, ch. 270, p. 388.) The statute provided for the compulsory education of children of specified age with certain exceptions. A child was exempt under the statute upon proof "that such child is being taught in a private school, or by a private tutor, or at home by any person capable of teaching, in such branches as are usually taught in the primary and grammar schools of this state." (Stats. 1903, ch. 270, § 1, p. 388.) By its express terms, the statute allowed for home schooling by any person capable of teaching.

---

[22] *Turner* concluded that if a private school included a parent or tutor teaching at home, there would be no necessity for the private tutor exemption. But the private school exemption requires "full-time" teaching by a person capable of teaching, while the private tutor exemption requires only three hours per day of teaching by a credentialed teacher. Thus, a child tutored by a credentialed teacher for only three hours per day would be exempt under the private tutor exemption, *but not* under the private school exemption.

In 1919, the statute was amended. By this amendment, each exemption from compulsory education was set forth in its own paragraph. One paragraph exempted "[c]hildren who are being instructed in a private full-time day school by persons capable of teaching; *provided*, that such school shall be taught in the English language and shall offer instruction in the several branches of study required to be taught in the public schools of this state . . . ." (Stats. 1919, ch. 258, § 1, pp. 406, 407.) The following paragraph provided an exemption for "[c]hildren who are being instructed, in study and recitation, for at least three hours a day for one hundred sixty days each calendar year by a private tutor or other person, in the several branches of study required to be taught in the public schools of this state, and in the English language; *provided*, that such tutor or other person shall be capable of teaching . . . ." (*Ibid.*) By this enactment, the express exemption for teaching "at home" was removed. However, as the statute permitted education by a "tutor or other person . . . capable of teaching," it appears that home schooling was still permitted under this exception.[23]

The next change came in 1929. When the School Code was reenacted, the provision regarding the private tutor exemption changed. No longer could a child be tutored by a person "capable of teaching." Now, "Such tutor or other person shall hold a valid state credential for the grade taught." (Stats. 1929, School Code Supplemental Acts, ch. 885, p. 368.) In other words, while the former statute allowed education at home by any person capable of teaching, the 1929 statute expressly amended that exception and mandated that any tutor must have a valid credential.[24]

In 1943, the Legislature established the Education Code, and the provisions of the former statutes were incorporated into the Education Code as then-sections 16624 and 16625. The private school exemption, found in then-section 16624, exempted "[c]hildren who are being instructed in a private full-time day school by persons capable of teaching." (Stats. 1943, ch. 71, p. 642.) The private tutor exemption, found in then-section 16625, exempted

---

[23] It could conceivably be argued that the 1919 amendment allowed home schooling under the *private school* exemption. (See, e.g., *Texas Educ. Agency v. Leeper* (Tex. 1994) 893 S.W.2d 432, 435 [concluding that, when Texas eliminated its private tutor exemption, the legislative history indicated that a child pursuing a bona fide course of home study was considered to be attending a private school].) The argument, however, appears strained. As between instruction in a "private full-time day school by persons capable of teaching" and instruction "by a private tutor or other person . . . capable of teaching," home schooling fits more logically into the latter category.

[24] The bill making this change was amended once. The original draft of the bill simply added the credential requirement. (Assem. Bill No. 554 (1929 Reg. Sess.) § 1.) As amended, however, the phrase "Children not attending a private full-time day school, and" was added to the beginning of the private tutor exemption. (Assem. Amend. to Assem. Bill No. 554 (1929 Reg. Sess.) Mar. 25, 1929.) In other words, the Legislature was clearly excepting private full-time day schools from the credential requirement added to the private tutor exemption.

children "not attending a private full-time day school, and who are being instructed in study and recitation for at least three hours a day for 170 days each calendar year by a private tutor or other person . . . . The tutor or other person shall hold a valid State credential for the grade taught." (*Ibid.*)

Education Code former section 16624, the private school exemption, was ultimately recodified as Education Code section 48222. Education Code former section 16225, the private tutor exemption, was ultimately recodified as Education Code section 48224. This statutory reorganization preserved the provisions whereby a teacher in a private full-time day school need only be a person "capable of teaching" (Ed. Code, § 48222), while a private tutor or other person must "hold a valid state credential for the grade taught" (Ed. Code, § 48224).

In short, home schooling was initially *expressly* permitted in California in the 1903 statute, *impliedly* permitted as part of the private tutor exemption in the 1919 statute, and apparently *prohibited* by the addition of the credential requirement to the private tutor exemption in 1929. It appears, then, that the Legislature's intent was *not* to permit home schools as part of the private school exemption. The *Turner* and *Shinn* opinions, in 1953 and 1961, reached this conclusion. The fact that the Legislature did not act to supersede those opinions by legislation is further evidence, albeit slight, that the Legislature did not intend to permit home schooling. (*Wilcox v. Birtwhistle, supra,* 21 Cal.4th at p. 983 [" 'legislative silence after a court has construed a statute gives rise at most to an arguable inference of acquiescence or passive approval' "].)

### f. *Subsequent Legislative Activity*

While the Legislature has never acted to expressly supersede *Turner* and *Shinn,* it has acted as though home schooling is, in fact, permitted in California.

### (1) *Affidavit Requirement*

For example, the Superintendent of Public Instruction is required to compile a list of all private schools filing affidavits. (Ed. Code, § 33190.) However, in 1991, the Legislature enacted an uncodified law providing, "Notwithstanding Section[] 33190 . . . of the Education Code, . . . the State Department of Education shall expend no funds to prepare . . . a compilation of information on private schools with five or fewer students." (Stats. 1991, ch. 118, § 2.00, item 6110-001-001, par. 5, pp. 812, 1085, eff. July 16, 1991.) It is suggested that this reflects the Legislature's understanding that numerous home schools file private school affidavits in California. This is not an

unreasonable interpretation. While it is possible that some private schools with five or fewer students are, in fact, traditional private schools in which the teacher is unrelated to the students, it is much more likely that the private schools referred to by this law are home schools.[25]

### (2) Exception to Fingerprint Requirement

 Another legislative enactment, however, makes more explicit the Legislature's acknowledgement of home schools. Education Code section 44237, subdivision (a) provides that every private school shall require each applicant for employment to submit fingerprints for criminal record checks.[26] The statute, however, exempts "a parent or legal guardian working exclusively with his or her children." (Ed. Code, § 44237, subd. (b)(4).) Home schooling advocates argue that this exemption was intended to exempt home schooling parents. While the legislative history of Education Code section 44237 is somewhat complicated, it confirms this interpretation, and also reflects the Legislature's apparent intent to accommodate home schooling parents.

The fingerprint statute was initially enacted in 1984. (Stats. 1984, ch. 1088, § 2, p. 3709.) Prior to its enactment, the bill was amended to provide an exemption for home schooling parents, but the exemption was removed before the bill was enacted. (See Assem. Amend. to Assem. Bill No. 2989 (1983–1984 Reg. Sess.) Apr. 2, 1984; Sen. Amend. to Assem. Bill No. 2989 (1983–1984 Reg. Sess.) Aug. 6, 1984.)

The fingerprint statute was amended in 1986. (Stats. 1986, ch. 72, §§ 3, 4, p. 189.) Again, an amendment to the bill was proposed in order to exempt home schooling parents, and again the amendment was removed from the bill before it was enacted. (See Assem. Amend. to Assem. Bill No. 1531 (1985–1986 Reg. Sess.) June 12, 1985; Assemblyman Bates, sponsor of Assem. Bill No. 1531 (1985–1986 Reg. Sess.) mem.;[27] Assem. Amend. to Assem. Bill No. 1531 (1985–1986 Reg. Sess.) July 11, 1985.)

---

[25] A bill analysis performed for an unrelated bill stated that "[o]f the 4,500 private schools, 1,335 had ten or fewer students. These are, typically, where parents have declared the home to be a 'school' where parents teach their own children." (Assem. Com. on Education, Analysis of Assem. Bill No. 1989 (1983–1984 Reg. Sess.) Mar. 21, 1984.)

[26] The statute exempts credentialed teachers and licensees of other state agencies that require a criminal record summary.

[27] An undated note in the file of Assemblyman Tom Bates, the bill's author, states that the bill "[w]ould exempt from the provisions of AB 2989 those private 'home schools' in which a parent is the teacher and the students are the teacher's own children. [¶] This amendment was suggested by the Association for Home-Centered Learning. It would seem ridiculous to require parents to obtain a criminal record summary on [themselves]."

Finally, in 1998, the fingerprint statute was amended to include the language exempting "a parent or legal guardian working exclusively with his or her children." (Stats. 1998, ch. 840, §§ 3, 4.) This language was intended to exempt parents and guardians employed in home study programs if they worked "exclusively with [their] children." (Sen. Rules Com., Off. of Sen. Floor Analysis, Analyses of Assem. Bill No. 2102 (1997–1998 Reg. Sess.) as amended Aug. 17, 1998.)

From this legislative history, it seems clear that the Legislature both *understood* that some parents home school their children by designating their home schools as private schools, and *sought to benefit* those parents by exempting them from the fingerprint requirement.

### (3) *Other Statutes and Regulations*

There are other statutes and regulations that similarly acknowledge, with apparent tacit approval, that home schools are private schools.[28] Education Code section 56346 discusses special education services for students with disabilities. Subdivision (g) of section 56346 references "a child who is home schooled." Health and Safety Code section 42301.6 prohibits certain hazardous air emissions within 1,000 feet of a school; but section 42301.9 specifically exempts from the definition of "school" "any private school in which education is primarily conducted in private homes."[29] California Code of Regulations, title 17, section 93115.4, subdivision (a)(67) has a similar definition relating to Airborne Toxic Control Measures.

### g. *Conclusion Regarding Legislative Interpretation*

In our attempt to determine the Legislature's intent with regard to the issue of whether a home school is a private school, we are therefore in a

---

[28] Not *all* regulations regarding private schools, however, do so. California Code of Regulations, title 21, section 3532, subdivision (c)(1) prohibits anyone from taking off or landing a helicopter "within 1000 feet of the boundary of any public or private school that maintains kindergarten classes or any classes in grades 1 through 12, unless at a permitted heliport or an EMS landing site, without [a permit]." California Code of Regulations, title 17, section 2508 provides, "It shall be the duty of anyone in charge of a public or private school, kindergarten, boarding school, or day nursery to report at once to the local health officer the presence or suspected presence of any of the communicable diseases." Each of these regulations would be absurd if applied to every home school. Indeed, if home schooling parents are considered teachers, they would be mandated abuse reporters under Penal Code section 11165.7, subdivision (a), and any failure to report known or suspected abuse or neglect would be a misdemeanor (Pen. Code, § 11166, subd. (c)). We very much doubt that the Legislature intended home schooling parents to be subject to additional penalties for abuse and neglect solely because they have chosen to teach their children.

[29] That definition of "school" also requires more than 12 children.

somewhat unusual situation. The most persuasive interpretation of the legislative history of the original statutory provisions supports the conclusion that a home school is not a private school. However, the most logical interpretation of subsequent legislative enactments and regulatory provisions supports the conclusion that a home school can, in fact, fall within the private school exception to the general compulsory education law.

Guidance is provided by the law regarding implied repeal. "The law shuns repeal by implication and, if possible, courts must maintain the integrity of both provisions. [Citation.] '[R]epeal may be found where (1) "the two acts are so inconsistent that there is no possibility of concurrent operation," or (2) "the later provision gives undebatable evidence of an intent to supersede the earlier" provision.' [Citation.]" (*Sutter's Place Inc. v. Superior Court* (2008) 161 Cal.App.4th 1370, 1382 [75 Cal.Rptr.3d 9].)

We are not concerned with two legislative *acts* which are contradictory, but two legislative *intents* which are. The integrity of the apparently contradictory provisions can be maintained if we simply conclude that the compulsory education law is to be interpreted to permit home schools to operate as private schools. This does no violence to the language of the private school exemption, which is ambiguous and therefore capable of the interpretation. Further, it gives meaning to the parent exception from the fingerprint requirement, and the other statutory and regulatory provisions that appear to recognize the existence of home schools as private schools. The alternative—interpreting the private school exemption *not* to include home schools—would render meaningless all of the above described subsequently enacted or adopted statutory and regulatory provisions. We therefore conclude that home schools may constitute private schools.

### h. *Additional Reasons Which Support Our Conclusion*

We reach the above conclusion based on our interpretation of the legislative intent. However, three other principles of statutory construction also support the result. These are: (1) administrative construction; (2) reliance; and (3) avoidance of constitutional questions.

#### (1) *Administrative Construction*

"An agency interpretation of the meaning and legal effect of a statute is entitled to consideration and respect by the courts; however, unlike quasi-legislative regulations adopted by an agency to which the Legislature has confided the power to 'make law,' and which, if authorized by the enabling legislation, bind this and other courts as firmly as statutes themselves, the binding power of an agency's *interpretation* of a statute or

regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) "Courts must, in short, independently judge the text of the statute, taking into account and respecting the agency's interpretation of its meaning, of course, whether embodied in a formal rule or less formal representation. Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court. Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth." (*Id.* at pp. 7–8.)

In this case, we sought amicus curiae briefing from the Superintendent of Public Instruction and the Department of Education. In their letter brief, they expressed their opinion that, "it is legally permissible for [parents] to qualify as a private school and teach their children in their own home." Both the Governor and Attorney General agree with this interpretation, as does the Los Angeles Unified School District (LAUSD). While the interpretation of the private school exemption is ultimately an issue for the courts, we find it significant that education and enforcement officials at both the state and local levels agree that home schools may constitute private schools.

### (2) *Reliance*

In reaching our conclusion, we are, of necessity, disagreeing with the interpretation of the private school exemption set forth in the earlier California cases of *Turner* and *Shinn*. In determining whether to disregard a prior judicial decision, we may inquire whether "the law's growth in the intervening years has left [the case]'s central rule a doctrinal anachronism discounted by society . . . ." (*Planned Parenthood of Southeastern Pa. v. Casey* (1992) 505 U.S. 833, 855 [120 L.Ed.2d 674, 112 S.Ct. 2791].) This appears to be the case in this instance. It is estimated that there are 166,000 children being home schooled in California.[30] It is a growing practice across the nation.[31] The Legislature is aware that home schooling parents file affidavits as private schools, and has passed laws based on that awareness. The Department of Education has not challenged the practice, and the LAUSD has not asserted that the children of such parents are truant. In short, the rule of *Turner* and *Shinn* has been discounted as a doctrinal anachronism, and clinging to such precedent would undermine a practice that has been, if not actively encouraged, at least acknowledged and accepted by officials and the public for many years.

---

[30] See footnote 17, *ante*.

[31] Studies indicate 2.2 percent of the entire student population of the United States was home schooled in 2003, up from 1.7 percent in 1999. (Amicus curiae brief of Gifted Homeschoolers Forum et al.)

### (3) *Avoidance of Constitutional Questions*

If a statute is susceptible of two constructions, one of which renders it constitutional and the other unconstitutional (or raises serious and doubtful constitutional questions), the court will adopt the construction which will render it free from doubt as to its constitutionality, even if the other construction is equally reasonable. (*In re Marriage Cases, supra*, 43 Cal.4th at p. 800 & fn. 21.) In this case, the private school exemption is susceptible of two constructions—one which permits home schools as private schools and one which does not. If home schools are not permitted in California unless under the private tutor exemption (requiring the tutor to be credentialed), this raises difficult constitutional questions.

The sole United States Supreme Court case directly addressing home education concluded that members of the Old Order Amish religion possessed a constitutional right to exempt their children from Wisconsin's compulsory education law after the eighth grade. (*Wisconsin v. Yoder* (1972) 406 U.S. 205 [32 L.Ed.2d 15, 92 S.Ct. 1526] (*Yoder*).) While the facts in *Yoder* are clearly different from the facts in this case, we recognize that, if we interpret California's compulsory education law to prohibit home schools unless taught by a credentialed teacher, California's statutory scheme would present the same constitutional difficulties as the scheme in *Yoder* if *applied to parents similarly situated* to the Old Order Amish. In other words, if the *Yoder* parents were subject to California's compulsory education law (and without taking into account any issue with respect to a required curriculum—see fn. 35, *post*), the law would be unconstitutional as to them if home schools were not private schools, but the constitutional difficulty would disappear under the interpretation that home schools may be private schools. As such, the interpretation we adopt avoids the constitutional difficulty.

### 2. *Constitutionality of the Restrictions on Home Schooling*

In this case, the dependency court declined to consider whether sending Jonathan and Mary Grace to public or traditional private school was necessary to preserve their safety because it believed that parents possess an absolute constitutional right to home school. This is incorrect; no such absolute right to home school exists. Instead, as we now discuss, parents possess a constitutional liberty interest in directing the education of their children, but the right must yield to state interests in certain circumstances. Proper analysis of the constitutional issue raised by this case requires two steps. First, we must determine the level of scrutiny to be applied to any statutes which interfere with the parental liberty interest. Second, we must apply that scrutiny to the restriction on home schooling at issue in this case, in order to determine its constitutionality.

### a. *If a Restriction on Parents' Right to Direct Their Children's Education Survives Strict Scrutiny, It Is Constitutional*

 Early United States Supreme Court cases established that parents possess a liberty interest, protected by the due process clause, in directing the education of their children. (*Prince v. Massachusetts* (1944) 321 U.S. 158, 166 [88 L.Ed. 645, 64 S.Ct. 438]; *Pierce v. Society of Sisters* (1925) 268 U.S. 510, 534–535 [69 L.Ed. 1070, 45 S.Ct. 571]; *Meyer v. Nebraska* (1923) 262 U.S. 390, 399 [67 L.Ed. 1042, 43 S.Ct. 625].) In those cases, however, the right was not protected by strict scrutiny, and restrictions on the right were upheld if they satisfied rational-relation review. (*Prince v. Massachusetts, supra,* 321 U.S. at pp. 168–170; *Pierce v. Society of Sisters, supra,* 268 U.S. at pp. 535–536; *Meyer v. Nebraska, supra,* 262 U.S. at pp. 399–400.)

However, more recent authority discussing the interest has not set forth the standard of scrutiny. (See *Troxel v. Granville* (2000) 530 U.S. 57, 80 [147 L.Ed.2d 49, 120 S.Ct. 2054] (conc. opn. of Thomas, J.) [suggesting that he would apply strict scrutiny to protect this right].) In light of *Troxel,* two California cases have applied strict scrutiny in cases alleging violations of the parental liberty interest. (*Herbst v. Swan* (2002) 102 Cal.App.4th 813, 819 [125 Cal.Rptr.2d 836]; *Punsly v. Ho* (2001) 87 Cal.App.4th 1099, 1107 [105 Cal.Rptr.2d 139].)

 Moreover, it has been suggested that when a parental liberty interest claim is *combined* with a free exercise claim, strict scrutiny is required.[32] (*Employment Div., Ore. Dept. of Human Res. v. Smith, supra,* 494 U.S. at pp. 881–882; *Yoder, supra,* 406 U.S. at pp. 233–234.) Thus, the level of scrutiny to which alleged violations of the parental liberty interest in directing the education of one's children are subject is not clearly established. Nonetheless, it is clear that if a restriction on the right satisfies strict scrutiny, the restriction is constitutional.

 To satisfy the test of strict scrutiny, a state must establish (1) that the law in question is supported by a compelling governmental interest and;

---

[32] As the parents in this case assert a religious motivation for home schooling their children, they also argue that restricting their right to home school violates the First Amendment's bar on laws prohibiting the free exercise of religion. An asserted violation of the federal free exercise clause, standing alone, is not subject to strict scrutiny. (*City of Boerne v. Flores* (1997) 521 U.S. 507, 536 [138 L.Ed.2d 624, 117 S.Ct. 2157]; *Employment Div., Ore. Dept. of Human Res. v. Smith* (1990) 494 U.S. 872, 885 [108 L.Ed.2d 876, 110 S.Ct. 1595].) The California Supreme Court has not yet determined whether California's free exercise clause provides a greater protection than the federal free exercise clause. (*Catholic Charities of Sacramento, Inc. v. Superior Court* (2004) 32 Cal.4th 527, 560–561, 566 [10 Cal.Rptr.3d 283, 85 P.3d 67] [concluding it is unnecessary to reach the issue as the statute in that case would satisfy even strict scrutiny].)

(2) that the law is narrowly tailored to meet that end. (*Catholic Charities of Sacramento, Inc. v. Superior Court, supra,* 32 Cal.4th at p. 562.) As an alternative phrasing of the second element, the statute must represent the "least restrictive means" of achieving the interest. (*Ibid.*)

b. *Application of Strict Scrutiny to the Restriction in This Case*

■ We are here concerned with Welfare and Institutions Code section 245.5, under which the juvenile court possesses the power to "direct all such orders to the parent, parents, or guardian of a minor who is subject to [dependency] as the court deems necessary and proper for the best interests of . . . the minor." In this case, the order requested is an order that the child attend public or traditional private school; the interest raised is the protection of the safety of the child. Specifically, it is argued that the safety of the child cannot be guaranteed when the child is shielded from all mandated reporters of child abuse.

■ While parents generally have a parental liberty interest, California also has recognized that the "welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [19 Cal.Rptr.2d 544, 851 P.2d 826].) The United States Supreme Court in *Yoder* recognized that "the power of the parent, even when linked to a free exercise claim, may be subject to limitation . . . if it appears that parental decisions will jeopardize the health or safety of the child . . . ." (*Yoder, supra,* 406 U.S. at pp. 233–234.) "[A] parent's own constitutionally protected 'liberty' includes the right to 'bring up children' [citation], and to 'direct the upbringing and education of children.' [Citation.] As against the state, this parental duty and right is subject to limitation only 'if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens.' [Citation.]" (*In re Roger S.* (1977) 19 Cal.3d 921, 928 [141 Cal.Rptr. 298, 569 P.2d 1286].)

■ We therefore consider the constitutionality of allowing a dependency court to restrict home schooling in order to satisfy the compelling governmental interest of the child's safety. To pose the question is to answer it. We emphasize that we are here concerned with a proceeding in *dependency*. In this case, the restriction on home schooling would arise in a proceeding in which the children *have already been found dependent due to abuse and neglect of a sibling*. We are therefore not concerned with the interference with the rights of a fit parent; the parents in dependency have been judicially determined not to be fit. ■ "The focus of dependency proceedings is on the child, not the parent. . . ." (*In re Hadley B.* (2007) 148 Cal.App.4th 1041, 1048 [56 Cal.Rptr.3d 234].) "The juvenile court ' "stands *in loco parentis* to the minor in a proceeding whose primary consideration is the

minor's welfare." ' " (*Ibid.*) "The purpose of dependency proceedings is to prevent risk, not ignore it." (*In re Eric B., supra,* 189 Cal.App.3d at p. 1004.)

 Should a dependency court conclude, in the proper exercise of its discretion, that due to the history of abuse and neglect in the family, requiring a dependent child to have regular contact with mandated reporters is necessary to guarantee the child's safety, that order would satisfy strict scrutiny. There can be no dispute that the child's safety is a compelling governmental interest. Restricting home schooling also appears to be narrowly tailored to achieving that goal. Without contact with mandated reporters, it may well be that the child's safety cannot be guaranteed without removing the child from the parents' *custody.*[33] As such, the restriction on home schooling would be the least restrictive means of achieving the goal of protecting the children; they would be permitted to continue to live at home with their parents, but their educators would change in order to provide them an extra layer of protection.

### 3. *Consideration of the Dependency Court's Ruling in This Case*

Having established that the order sought by counsel for Jonathan and Mary Grace would not be unconstitutional, we will remand for the trial court to consider whether the safety of the children necessitates removing them from home schooling. In this regard, the trial court should consider the history of abuse in the family, the father's continued refusal to accept that he abused his children,[34] the parents' ongoing lack of cooperation with investigating social workers, and any further relevant factual matters that have developed since the time the motion was originally considered.

---

[33] In this regard, we note the following colloquy between the trial court and father:
"The Court: You know where I get about 99 percent of my referrals of sexual abuse?
"The Father: I know what you are going to say. From the public school system.
"The Court: Amazing, isn't it? That is exactly correct.
"The Father: Is that the purpose of the public school system[]? [¶] . . . [¶]
"The Court: One of the purposes of a teacher, however, one of the obligations is to report abuse, be it physical or sexual, and it is just amazing when little Jenny goes to school and is totally depressed or has got bruises all over them, that a teacher just—what is the matter, Jenny? And Jenny says, I've been struck by Mr. [C.] or he is playing around with me in places that he shouldn't be playing."
"The Father: There is also a lot of time when they say stuff that isn't true.
"The Court: Well, that may be, but because the children are—
"The Father: The panacea for our society is not to have a world of snitches that are going to be there to say things that aren't necessarily true or not."

[34] In this context, we quote a further exchange between the trial court and father:
"The Father: You are wrong because you are assuming that I abused my children, and I did not abuse my children.
"The Court: And you didn't abuse [one of Rachel's sisters] either.
"The Father: No, I did not.
"The Court: And she claimed you did, and we sustained the petition."

### 4. *California Has Few Express Limitations on Home Schooling*

We close with an observation that the fact that home schooling is permitted in California as the result of implicit legislative recognition rather than explicit legislative action has resulted in a near absence of objective criteria and oversight for home schooling.[35] In this regard, while we do not attempt a comprehensive review of other states' requirements, we note some of the methods used by other states to guarantee that their home schooled children are receiving an adequate education.

In some states, discretion to approve home schooling is granted to state, county or district officials.[36] In several states, capable teaching is assured by requiring the parent to possess a certain minimum level of education in order to home school, generally a high school diploma or its equivalent.[37] Various states require home schooling parents to regularly submit documents—either reports or samples of the children's work—to authorities, in order to ensure the child is being educated.[38] A few states measure home schooled students' progress by means of standardized testing, although alternative means of

---

[35] We are concerned in this proceeding with the right of a dependency court to overrule a parent's decision to home school when required to protect the safety of the child. The remaining restrictions on home schooling in California, which are not at issue in this case, include: (a) home schooling parents must file a private school affidavit; (b) home schooling parents must be capable of teaching; (c) home schooling parents must teach in English and shall offer instruction in the subjects required to be taught in public schools; and (d) home school education must be a "full-time" school. (See also the extended discussion of the private school exemption at pp. 1091–1092 of this opinion.) We express no opinion on whether any of these requirements have been met by the home schooling at issue in this case.

[36] (See, e.g., Fla. Stat., § 1003.26, subd. (1)(f)(1) [approval by a "home education review committee," which reviews the student's portfolio every 30 days until it deems the program satisfactory]; La. Rev. Stat. Ann., § 17:236.1; N.M. Stat. Ann., § 22-2-2, subd. H; Ohio Admin. Code, 3301:34-03, subd. (C); 24 Pa. Cons. Stat., § 13-1327.1, subds. (h)–(m); Vt. Stat. Ann., tit. 16, § 166b; *Care & Protection of Charles* (1987) 399 Mass. 324 [504 N.E.2d 592, 597–598, 600] [upholding an advance approval requirement against a constitutional challenge]; *State v. Riddle* (1981) 168 W.Va. 429 [285 S.E.2d 359, 361–362] [same].)

[37] (See, e.g., Ga. Code Ann., § 20-2-690, subd. (c)(3); N.M. Stat. Ann., § 22-1-2.1, subd. (C); N.C. Gen. Stat., § 115C-564; 24 Pa. Cons. Stat., § 13-1327.1, subd. (a); S.C. Code Ann., § 59-65-40, subd. (A)(1); Tenn. Code Ann., § 49-6-3050, subd. (b)(4), (7) [high school diploma sufficient to home school through 8th grade; further education required to home school at high school level].) Ohio permits a parent without a high school diploma to home school only if supervised. (Ohio Admin. Code, 3301:34-03, subd. (A)(9).) North Dakota requires a baccalaureate degree to home school, and will permit a high school graduate to home school only if monitored. (N.D. Cent. Code, §§ 15.1-23-03, 15.1-23-06).)

[38] (E.g., Iowa Code, § 299A.4; Md. Code Regs., § 13A.10.01.01, subd. D(3); Minn. Stat., § 120A.24; Ohio Admin. Code, 3301:34-04; 24 Pa. Cons. Stat., § 13-1327.1, subd. (e); S.C. Code Ann., § 59-65-40, subd. (A)(4); Vt. Stat. Ann., tit. 16, § 166b, subd. (d); Va. Code Ann., § 22.1-254.1, subd. C; *Combs v. Homer Center School Dist.* (W.D.Pa. 2006) 468 F.Supp.2d 738, 745–746, 778 [upholding such a requirement against a constitutional challenge].)

evaluation are often permitted.[39] In several states, if a child fails to demonstrate sufficient progress, the home schooling of that child is placed on probation, or terminated altogether.[40] A number of states require home visits, although there is some dispute among the courts that have considered the issue whether requiring home visits is a constitutional limitation on parental rights.[41]

A few states have comprehensive regulations imposing several different requirements. For example, New York has promulgated regulations, which require (1) the parent to send an individualized home instruction plan for each student to the school district each year; (2) quarterly reports; (3) an annual assessment including a standardized achievement test (or alternative means of review); (4) a plan of remediation if the student falls below the 33d percentile on a standardized test; and (5) possible termination of home schooling if the remediation objectives are not met within two years. (N.Y. Comp. Codes R. & Regs. tit. 8, § 100.10.)

In contrast, California impliedly allows parents to home school as a private school, but has provided no enforcement mechanism. As long as the local school district verifies that a private school affidavit has been filed, there is no provision for further oversight of a home school. It appears that the propriety of any parent's home schooling will arise only in dependency (or family law) proceedings, as in this case, or in a prosecution for failing to comply with the compulsory education law. (See fn. 18, *ante*; see also *Turner, supra*, 121 Cal.App.2d at p. Supp. 863 [parents convicted of violating compulsory education law by home schooling]; *Shinn, supra*, 195 Cal.App.2d at p. 684 [home schooled children were declared truant].)

Given the state's compelling interest in educating all of its children (Cal. Const., art. IX, § 1), and the absence of an express statutory and regulatory framework for home schooling in California, additional clarity in this area of the law would be helpful.

---

[39] (E.g., Ark. Code Ann., § 6-15-504; Colo. Rev. Stat., § 22-33-104.5, subd. (3)(f); Fla. Stat., § 1002.41, subd. (1)(c); Ga. Code Ann., § 20-2-690, subd. (c)(7); Haw. Code R., § 8-12-18, subd. (a); Minn. Stat., § 120A.22, subd. 11.)

[40] (E.g., Colo. Rev. Stat., § 22-33-104.5, subd. (5)(a)(I); Fla. Stat., § 1002.41, subd. (2); Md. Code Regs., § 13A.10.01.03, subd. B.)

[41] Compare *Battles v. Anne Arundel County Bd. of Educ.* (D.Md. 1995) 904 F.Supp. 471, 472–473, 476, affd. (4th Cir. 1996) 95 F.3d 41 and *Matter of Kilroy* (N.Y.Fam.Ct. 1983) 121 Misc.2d 98 [467 N.Y.S.2d 318, 321] (upholding monitoring requirement) with *Brunelle v. Lynn Public Schools* (1998) 428 Mass. 512 [702 N.E.2d 1182, 1184, 1186] (monitoring is not necessary when standardized testing shows sufficient progress).

## *DISPOSITION*

The petition for writ of mandate is granted. The matter is remanded to the trial court with directions to vacate its order denying the motion to require Jonathan and Mary Grace to attend public or traditional private school, and to reconsider the motion in light of, and in a manner consistent with, the views expressed herein.

Klein, P. J., and Kitching, J., concurred.