Filed 10/22/24  In re E.H. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re E.H., a Person Coming Under the Juvenile Court Law. | B330047 (Los Angeles County Super. Ct. No. 23CCJP00357A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> A.H., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Linda L. Sun, Judge.  Affirmed.

Deborah Dentler, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica Buckelew, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this juvenile dependency appeal, A.H. (father) challenges the juvenile court's jurisdictional findings pertaining to his young son, E.H. (son). In particular, father argues substantial evidence does not support a finding that son was at substantial risk of physical harm or sexual abuse. Father seeks reversal of the jurisdictional findings and, therefore, also the court's subsequent removal and visitation orders.

We conclude substantial evidence supports the juvenile court's jurisdictional finding under Welfare and Institutions Code section 300, subdivision (b).[1] Accordingly, we affirm.

## BACKGROUND

When the underlying proceedings began, son's mother G.H (mother) and father had known each other for 10 years. They married in 2017. Son was born in January 2022.

### 1. Father's Pattern of Molesting Minor Girls

For years prior to son's birth, father sexually molested several minor female relatives. Father admitted to touching two sisters, maternal grandnieces A.T. and M.T., inappropriately. Although father denied inappropriate conduct with anyone else, during the course of the proceedings below, two additional female

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

minors reported father had molested them and one other female minor reported father sent her inappropriate text messages.

### a.    A.T. and M.T.

A.T. and M.T. are mother's grandnieces.  At the time the underlying proceedings began, A.T. was 13 years old and M.T. was 12 years old.  For some time prior to the underlying proceedings, they and their family lived in a home on the same property where mother, father, paternal grandmother and paternal step-grandfather lived in a separate house.  The girls visited and slept over at mother and father's home often.  When the sexual abuse began, A.T. was approximately nine years old and M.T. was seven years old.

M.T. said father "often" and "frequently" touched and rubbed her legs, back, butt, and thighs, sometimes under her underwear.  At times, he held M.T. on his lap and rubbed her over his groin area.  M.T. reported that, on multiple occasions after she had fallen asleep on the couch, father tried to carry her to his bedroom but she managed to "wiggle free."  M.T. said "things got worse when she turned 8 years old" and, similarly, "things became worse" and father "got 'more touchy' " when she was between the ages of eight and nine.  M.T. said the abuse occurred "anywhere in the pool or the Livingroom area" and sometimes in a car.

A.T. similarly stated father rubbed his hand on her thigh and pelvic area, making her feel uncomfortable.  However, she said father "did a lot more to her sister" M.T.  A.T. saw father touch M.T. many times when they were in mother and father's home on the shared property.  She said father "would always touch her sister on her thighs and stomach and it would happen

3

in the living room or in [father's] bedroom when they were messing around."

Father admitted to some of the behavior reported by A.T. and M.T. Father stated he touched A.T. inappropriately three times and M.T. one time in 2019 or 2020, during the time they all lived on the same property. He said he knew what he was doing was wrong, but he thought A.T. "knew and came on to me, but not." Father denied ever putting his hands inside the sisters' pants. He no longer had contact with A.T. or M.T. The girls' mother reported, during the time of the abuse, A.T. and M.T. often spent the night with mother and father in their home on the shared property. Once the girls revealed father's inappropriate conduct to their parents, the family moved away and no longer had contact with mother or father.

In 2019, mother confronted father about allegations of inappropriate conduct with A.T. and M.T. Father denied everything. In early 2020, because of the allegations, mother and father separated for one year. After they reconciled, mother again confronted father about the allegations. At that time, father told mother he had touched A.T. and M.T. inappropriately a few times. Mother believed father had changed, saying, "He wasn't the same person" he was in 2019 and earlier, when the sexual abuse took place. Father was "heavily involved in church and getting the support he needs." He participated in "an AA like meeting for his sexual recovery" once a week and met with church pastors "as needed." According to mother, father began attending church and a "recovery program through church" in April 2020. Mother stated father himself was a victim of child sexual abuse and had both a sexual addiction and addiction to pornography.

4

**b.    C.H.**

C.H. is mother's niece.  At the time the underlying proceedings began, C.H. was 14 years old.  During both a police interview and a forensic interview, C.H. reported father sexually molested her when she was younger.  She could not remember exact dates, but stated father molested her for approximately six years, when she was between the ages of six and twelve.  C.H. said she spent a lot of time with mother and father and was very close with them.  On one occasion when she slept over at their home, mother had C.H. sleep in between mother and father.  During the night, father held C.H.'s side with his hand and she could feel his erect "penis against her buttocks."  "[S]he could feel [him] on her all night."  Other times, father touched C.H.'s upper thighs and rubbed her vagina under her shorts.  C.H. said "this happened a lot."  He had her sit very close to him or on his lap.  She reported father "would move her on his lap and that [he] would get 'hard' from her sitting on him."  When asked about the "worst time," C.H. described an incident when father moved her shorts and underwear to the side and rubbed her vagina with his fingers.

Father and mother both denied C.H.'s allegations.  Mother stated C.H. never spent the night at their house, mother never had kids in her bed, and "[t]he timeframe is off."

**c.    Y.H.**

Y.H. is C.H.'s sister and also mother's niece.  She reported father sent her text messages when she was 16 years old, asking "about her having sex and asking for naked pictures of her."  Y.H. told a forensic interviewer that "everyone knew of the abuse including the maternal grandmother and mother."

5

Mother found out about the text messages between father and Y.H. and confronted them. Father and Y.H. told mother nothing happened. Mother said she " 'read [through] the text. There was nothing there. That was it.' " She said she did not see anything "in a sexual manner." Mother described Y.H. as "very provocative," "smoking weed," "skipping school," and "having sex."

### d.    L.T.

L.T. is a paternal niece. She reported father sexually abused her. She also had been abused by father's father. She "did not want to go through the Court process again" and did not give details about the sexual abuse by father.

## 2.    Father's Own Sexual Abuse as a Child, Efforts at Rehabilitation, and Arrest

Father was molested as a minor by his own father, who also had sexually molested minor female family members and was incarcerated. Father stated he began going to church in 2019. He said he completed a 12-step program through his church for sexual addiction and codependency and was in the process of enrolling in individual therapy. He said he met with his pastor once a week and with his lead pastor as needed. In January 2023, father reported he had been "sober of pornography and masturbation" for 60 days. He was seeking help and support through his church and believed he was "a changed man."

Father's pastor confirmed father had participated in a 12-step program as well as "a more intensive" yearlong 12-step study program, with a sponsor. After graduating from the program in 2021, father began leading small groups in the church's 12-step program. The pastor said father was " 'one of the biggest greatest

transformations in recovery at our church.' " The pastor had no child safety concerns regarding father.

In January 2023, father was arrested and incarcerated on two counts of child sexual molestation. He was incarcerated for the duration of the underlying proceedings.

Following father's arrest, maternal grandmother stated she had no concerns about mother's or father's ability to care for son. Maternal grandmother said, "They're great parents," and "I appreciate [father] being a good husband and father for my daughter." Sometime after father's arrest, his brother (paternal uncle), who was a church pastor, harassed police officers at the police station and demanded to speak with father. A few days later, paternal uncle returned to the police station and stated "he was father's priest, and therefore, their conversation could not be recorded." A detective believed paternal uncle was coaching mother and stated mother "stopped cooperating" after speaking with paternal uncle. Mother expressed her desire to remain married and committed to father.

### 3. Petition, Adjudication, Disposition

In January 2023, soon after father's arrest, the Los Angeles County Department of Children and Family Services (Department) filed a four-count section 300 petition on behalf of son. The petition stated counts under subdivisions (b) and (d) of section 300 and alleged father had molested both A.T. and M.T. on multiple occasions and mother had failed to protect son. At the detention hearing, the juvenile court detained son from father and released son to mother, with whom son stayed for the duration of the underlying proceedings. The Department later filed an amended petition, which added subdivision (b) and (d) counts related to father's molestation of C.H.

7

In its jurisdiction report for the court, the Department acknowledged "father has taken accountability for his actions and started his recovery for porn addiction through a faith-based program." Nonetheless, the Department believed father required "a structured evidence based program by professional staff whose area of concentration is sexual abuse for perpetrators" and "therapy through a licensed clinician to address his own childhood trauma as a sexual abuse victim." Given the multiple allegations and charges against father of sexual abuse of children in the family, the Department was concerned about father's ability to parent a child safely. The Department also was concerned mother was "unable and unwilling to recognize," and gave excuses for, father's behavior. For example, the Department noted mother "insinuated that the cousins [A.T., M.T., and C.H.] were possibly in cahoots as they provided similar statements" and mother placed blame on Y.H. for father sending her unsolicited text messages, describing Y.H. as provocative and "going through issues." The Department stated it could "only speculate that the mother['s] lack of insight of sexual abuse and her willingness to only believe the father's statements places [son] at risk of future sexual abuse, and that the mother would not be protective of [son] if the father was around."

The adjudication and disposition hearing was held on May 17, 2023. By that date, mother had completed a parenting class and a three-hour sexual abuse awareness and education class. Counsel for mother recognized the allegations regarding father were "horrendous." However, mother's attorney did not believe the allegations as to mother were supported by the evidence and, therefore, asked the juvenile court to strike mother from the petition.

8

Counsel for son argued the evidence amply supported the allegations against father.  Counsel noted not only had father admitted to touching two of the girls but also all of the girls were close to the family and father had groomed and bonded with them.  As to mother, son's counsel argued the court should dismiss the subdivision (d) counts but sustain the subdivision (b) counts.

Counsel for the Department urged the court to sustain the amended petition in its entirety.  Counsel described father's behavior as "abhorrent sexual behavior" aimed at prepubescent family members through marriage.  Counsel for the Department also expressed concern that mother had indicated she did not intend to divorce father and was close with his family.  The Department believed mother lacked sufficient insight into father's conduct.

Counsel for father argued, in total, "I ask that this petition be dismissed because the county failed to meet its burden with regard to a nexus to current risk with regard to [son]."

After hearing argument, the juvenile court sustained the amended petition as pleaded and declared son a dependent of the court under subdivisions (b) and (d) of section 300.  The court noted father had admitted to the allegations concerning his molestation of A.T. and M.T. and, as to the allegations concerning C.H., the court found C.H. "incredibly honest" and "extremely distraught and credible during her forensic interview."  The court found the allegations as to mother's failure to protect were true in part because mother "seems to minimize the sufferings of the victims" and, instead of calling law enforcement after father confessed to her, "she talked to her therapist."  The court found father to be "unequivocally a sexual predator," the victims were

9

all "very, very young," and "his conduct is sexually abhorrent." The court called it a "common sense conclusion" that "every person in the family home would be at risk of sexual abuse, and [father's] sexually abhorrent behaviors places [*sic*] young victims at risk of being sexually exploited." The court found the "danger of sexual abuse" to son "substantial."

The juvenile court removed son from father and continued son's placement in mother's care under Department supervision. The court ordered father to participate in sexual abuse counseling for perpetrators and individual counseling. Father was granted monitored visits with son.

### 4. Appeal

Father appealed the juvenile court's jurisdictional findings and dispositional orders. Mother did not appeal.

### 5. Postappeal Termination of Dependency Jurisdiction and Final Custody Order

In November 2023, while this appeal was pending, the juvenile court terminated jurisdiction and entered a final custody order.[2] The court granted sole physical custody of son to mother and joint legal custody to mother and father. The court ordered monitored visits for father with son. The final custody order indicates mother and father were no longer married or living together. Neither mother nor father appealed the court's November 2023 orders.

---

[2] We previously took judicial notice of both the juvenile court's November 27, 2023 minute order terminating jurisdiction and its November 27, 2023 final custody order.

## DISCUSSION

### 1.  Justiciability

As an initial matter, we address the justiciability of father's appeal.  As noted above, while father's appeal was pending, the juvenile court terminated jurisdiction and entered a final custody order.  Based on these postappeal events, we asked the parties to brief whether father's appeal was moot and, if so, whether we should exercise our discretion to hear the matter.  (Gov. Code, § 68081.)  The Department argued the appeal is moot and we should not exercise our discretion to consider the merits.  On the other hand, father responded we should consider the merits of his appeal.  Although father seems to assume the appeal is moot, he argues we should consider his appeal because not only do the court's jurisdictional findings continue to impact him adversely with respect to his visitation rights, the issue raised is of public importance and likely to occur again.  We conclude the appeal is not moot despite the juvenile court's termination of jurisdiction postappeal.  The court's jurisdictional findings continue to affect father adversely not only with respect to visitation, but also with respect to custody of son.  (*In re D.P.* (2023) 14 Cal.5th 266, 276–277.)

In *In re D.P.*, *supra*, 14 Cal.5th 266, our Supreme Court addressed the justiciability of dependency appeals such as father's here.  The court explained, "A court is tasked with the duty ' "to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." ' [Citation.]  A case becomes moot when events ' "render[] it impossible for [a] court, if it should decide the case in favor of

11

plaintiff, to grant him any effect[ive] relief." ' [Citation.] For relief to be 'effective,' two requirements must be met. First, the plaintiff must complain of an ongoing harm. Second, the harm must be redressable or capable of being rectified by the outcome the plaintiff seeks." (*Id.* at p. 276.)

Particularly relevant here, our Supreme Court noted, when a jurisdictional finding affects subsequent orders and "continues to impact a parent's rights—for instance, by restricting visitation or custody—that jurisdictional finding remains subject to challenge, even if the juvenile court has terminated its jurisdiction. [Citations.] Because reversal of the jurisdictional finding calls into question the validity of orders based on the finding, review of the jurisdictional finding can grant the parent effective relief." (*In re D.P.*, *supra*, 14 Cal.5th at pp. 276–277; see also *id.* at pp. 277–278.)

Here, in terminating its jurisdiction, the juvenile court issued a final custody order limiting father's custody of son and restricting visitation with son. Thus, even though the juvenile court terminated its jurisdiction, its jurisdictional findings continue to impact father's rights. If we were to reverse the jurisdictional findings, our decision would call into question the juvenile court's subsequent orders. Thus, we conclude father's appeal is not moot.

## 2. Dependency Jurisdiction

### a. Applicable Law

In this case, the juvenile court exercised its jurisdiction under subdivisions (b) and (d) of section 300. We address subdivision (b) first. Under that subdivision, a juvenile court may assert dependency jurisdiction over a child when, among other things, "[t]he child has suffered, or there is a substantial

12

risk that the child will suffer, serious physical harm or illness, as a result of . . . [¶] (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child." (§ 300, subd. (b)(1) (subdivision (b).)

"[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction." (*In re I.J.* (2013) 56 Cal.4th 766, 773.) "The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*.' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' " (*In re I.J.*, *supra*, at p. 773.) " 'The purpose of dependency proceedings is to prevent risk, not ignore it.' " (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.)

### b. Standard of Review

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) " 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise

independent judgment, but merely determine if there are sufficient facts to support the findings [and disposition order] of the trial court." ' " (*Ibid.*)  In determining whether substantial evidence exists such that a reasonable trier of fact could find the order challenged on appeal is appropriate, we review the entire record in the light most favorable to the challenged order.  (*Ibid.*)

"Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings."  (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.)  Substantial evidence " 'is not synonymous with any evidence.  [Citations.]  A decision supported by a mere scintilla of evidence need not be affirmed on appeal.' "  (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)

### c. Substantial evidence supports the juvenile court's jurisdictional findings under subdivision (b).

Father argues substantial evidence does not support the juvenile court's subdivision (b) jurisdictional findings.  He claims there was "zero evidence" mother would not protect son and no evidence father might ever abuse a male child, let alone his own biological one-year-old male child.  In contrast, the Department argues substantial evidence supports the court's finding that son was at risk under subdivision (b), noting the severity of father's actions and mother's lack of protective capacity.  We agree with the Department.

Both parties discuss our Supreme Court's decision in *In re I.J.*, *supra*, 56 Cal.4th 766 (*I.J.*).  In that case, the court addressed the question whether a father's sexual abuse of his minor daughter supported the exercise of dependency jurisdiction over the father's minor sons.  (*Id.* at p. 772.)  The court held it

14

did, concluding the father's repeated sexual abuse (including rape) of his minor daughter in the family home constituted substantial evidence supporting dependency jurisdiction over all of the father's children, regardless of gender and regardless of whether their father had abused all of them. (*Id.* at pp. 771, 778.) Our Supreme Court explained, "the more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300. If the sibling abuse is relatively minor, the court might reasonably find insubstantial a risk the child will be similarly abused; but as the abuse becomes more serious, it becomes more necessary to protect the child from even a relatively low probability of that abuse." (*Id.* at p. 778.) *I.J.* is not entirely on point here because it focusses on the exercise of dependency jurisdiction under subdivision (j) of section 300, which subdivision is not at issue here. Nonetheless, we conclude *I.J.* offers guidance and support for dependency jurisdiction in this case.

The record before us contains substantial evidence that son was at a substantial risk of harm. Although there is no evidence father sexually abused or otherwise injured son, a child need not "actually be abused or neglected before the juvenile court can assume jurisdiction." (*I.J.*, *supra*, 56 Cal.4th at p. 773.) The record is replete with evidence of father's longstanding aberrant sexual behaviors and abuse of prepubescent girls. For years, father sexually molested three young girls.[3] Although the girls

---

[3] Father also molested a fourth girl, his niece L.T. The record does not include details of that abuse and, therefore, we do not know whether it was as pervasive and severe as father's abuse of the other three girls.

were not father's biological children, they were extended family members who shared close familial relationships with mother and father, spending many nights and days in their home. A.T. and M.T. lived on the same property as father. Father unquestionably violated his position in the family with those girls. His behavior was a " 'betrayal of the appropriate relationship between the generations.' " (*I.J.*, *supra*, 56 Cal.4th at p. 778.)

Father also remained in denial as to much of the abuse he committed, which further supports a finding of risk to son. At first, father denied any wrongdoing. Eventually, he confessed to a handful of isolated incidents of abuse as to A.T. and M.T. only. However, as the girls described it, father molested them, especially M.T. and C.H., for years. His abuse was not isolated. It was pervasive. He also molested M.T. many times when A.T. was present and witnessed his aberrant behavior toward her sister. Additionally, father himself was a victim of sexual abuse as a young child. His own father subjected him to abuse and pornography. Although father attended various church programs, there is no evidence father participated in a clinical program designed specifically for perpetrators and victims of sexual abuse. Indeed, attending church programs, while certainly commendable, did not appear to have been entirely successful for father by the time the underlying proceedings began. In January 2023, approximately two years after graduating from the more intensive 12-step church program, he reported being "sober of pornography and masturbation" for 60 days. Having failed to recognize the full extent of his dangerous and aberrant conduct, it was not likely father would take steps

16

necessary to address and ameliorate that behavior. (*In re A.F.* (2016) 3 Cal.App.5th 283, 293.)

After briefing, father submitted a recently decided case in which the Fourth District reversed jurisdictional findings and dispositional orders concerning the mother's teenaged son. (*In re S.R.* (2024) 104 Cal.App.5th 44 (*S.R.*).) In that case, it was alleged, among other things, that the mother's teenaged son was at risk because the mother's fiancé allegedly had molested the mother's teenaged daughter in the family home and the mother failed to protect her son. (*Id.* at p. 51.) *S.R.* is factually distinct. In *S.R.*, the fiancé was alleged to have molested one teenaged girl. The son who the juvenile court had found to be at risk also was a teenager who had lived with the mother and her fiancé for nine years. The son stated he had never been sexually abused, would speak up if he ever were abused, and felt safe in the home. (*Id.* at pp. 49, 54.) In contrast, here, father molested several young girls over the course of many years. Son was of tender years, vulnerable, and unable to speak for himself. Also here, father admitted to some of his very aberrant behavior and that he himself had been sexually abused as a child by his father. *S.R.* is not persuasive here.

Given the severity of father's deviant sexual behavior, his continued denial and lack of clinical treatment, and his own abuse as a child by his father, we conclude substantial evidence supports the juvenile court's jurisdictional findings as to father under subdivision (b).

Because we affirm the juvenile court's jurisdictional findings as to father under subdivision (b), we need not and do not address the remaining jurisdictional findings. (*I.J.*, *supra*, 56 Cal.4th at p. 773.) Similarly, because father does not

independently challenge the juvenile court's dispositional orders, and we affirm the findings on which those orders are based, we need not and do not address the dispositional orders.

**DISPOSITION**

The juvenile court's May 17, 2023 order is affirmed.

NOT TO BE PUBLISHED.

                                    LUI, P. J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.

18